Appeal of GILLIAM MANUFACTUR-          Docket No. 964.
                ING CO.

> In determining the taxable gain on the sale of patents which had been developed by the taxpayer, expenditures in such development work may be capitalized and added to costs of patents.
> On the evidence, *held*, that the taxpayer is not entitled to a deduction on account of an alleged bad debt.

Submitted January 29, 1925; decided April 7, 1925.

*Jesse I. Miller, Esq.*, for the taxpayer.

*A. Calder Mackay, Esq.*, for the Commissioner.

Before JAMES, STERNHAGEN, and TRAMMELL.

This appeal involves income and profits taxes for 1918 and 1919 and is based upon the action of the Commissioner in determining the

profit on the sale of patents which were sold during 1919 by excluding from the cost thereof amounts alleged to have been expended in developing the patents and capitalized by the taxpayer on its books and in disallowing a deduction on account of a debt alleged to have been ascertained to have become worthless and charged off during 1918.

FINDINGS OF FACT.

The taxpayer was an Ohio corporation, with its principal office in Canton in that State. It was engaged in the business of manufacturing saddlery equipment and during the years 1911, 1912, 1913, 1914, and 1915, was experimenting and developing certain features in connection with automobile tops. The taxpayer employed a competent mechanical engineer named White to work out problems in manufacturing and to experiment with and to develop a new automobile top and supports for automobile tops. He received a salary of $200 per month from 1911 to 1916, when his salary was increased to $2,500 a year. One Haynes, designer and draftsman, was also employed. Seven other men were employed to assist and work with Haynes and White in connection with the experimentation and development of the automobile tops and parts thereof. All of these men devoted about one-half of their time to this work. Haynes also received a salary of $200 per month. The salaries paid to the men who were engaged in this work prior to August 31, 1915, amounted to $31,640. This amount does not include expenditures for materials used in the work, overhead or other expenses. In August, 1915, the taxpayer set up on its books as a capital charge representing the cost of the patents acquired prior to that date, the amount of $10,000. This was arrived at by a conservative estimate based upon the expenses incurred in connection with the development and procurement of the patents.

The patents were issued from time to time until 1918 when twelve or fourteen had been issued. In 1914, one patent was issued on a bow rest and clamp. White worked out the idea. He began on it in 1908 or 1909. The patent was issued to him and was assigned by him to the corporation for a nominal consideration.

Another patent was issued on February 16, 1915, on a body clamp device. Steiner, the president of the corporation, first conceived the idea and gave White a sketch of it. White then developed the idea after a great deal of work and experimentation.

Another patent was issued on September 7, 1915, on what was known as a bow rest and clamp device. This was issued to White and assigned by him to the corporation for a nominal consideration. Other patents were issued from time to time until 1919.

At the time of the capitalization of the patents on the books of the corporation on August 31, 1915, the corporation had only two patents which had been issued as the result of the development work and expenses incurred in connection therewith, although there were as many as twelve or more patents pending at that time. The patent which was issued in 1914 was a basic patent and some of the patents subsequently issued, which were included in the sale in 1919, were improvements based upon this basic patent.

The patents acquired in 1915 and prior thereto, as well as the other patents subsequently acquired, making a total of fifteen, were sold together in 1919 for $80,000. The taxpayer paid a commission on this sale of $5,000, paid out $755.58 for patent dies which were included in the sale, and had paid out in acquiring patents subsequent to August 31, 1915, $8,882.97. These amounts were added to the amount of $10,000 which was capitalized on the books as patent costs. The amount of $10,000 was disallowed by the Commissioner and was deducted from the cost of patents sold, as reported by the taxpayer in its income and profits tax return.

On January 15, 1915, one McKinley purchased from Steiner sufficient stock in the corporation to give him the controlling interest. He paid Steiner $10,000 in cash as the initial payment. On the same date there was a meeting of the stockholders to elect new officers. McKinley was elected president and treasurer. On January 20, 1915, five days afterwards, McKinley drew a check as treasurer of the corporation for $10,000 payable to the Union National Bank of Cleveland, Ohio. This check was for his personal benefit. He also gave the corporation's checks for $1,900 and $500, respectively, to one Seabury. About three months later Steiner, who was away at the time, returned. He was informed by a friend that it would be well for him to look into the affairs of the corporation as it was getting into financial difficulties and was borrowing money. He made inquiry and McKinley acknowledged that he had taken the $10,000 for his personal use which he agreed to repay as well as the amount paid to Seabury which he acknowledged was his own personal matter. McKinley later entered into a contract with Steiner in which he agreed to pay the amounts of the checks and gave security for the same consisting of a section of land in Wisconsin, certificates of preferred stock of the Houchin-Bippus Company of Chicago, certain certificates of stock in the McKinley Townsite Company, a Minnesota corporation, and also assigned a certain claim against Charles M. Backus Company of Chicago, for salary amounting to $4,200. McKinley at the same time surrendered to Steiner the stock which he had purchased and on which he had paid $10,000 as the initial payment.

The land in Wisconsin had tax liens against it amounting to between $300 and $400, but Steiner knew nothing of its value. No attempt was made to sell the land and no definite information was secured as to its value.

The $2,400 paid to Seabury was paid back by McKinley, $1,000 in 1917, and $1,400 in 1918. Nothing was realized from any of the securities. McKinley resigned as an employee of the corporation in 1918 and the securities were given to him when he left. The taxpayer considered that since he had left the employ of the company it could not collect the debt which he owed.

### DECISION.

The deficiency should be determined in accordance with the following opinion. Final decision will be settled on consent or on 10 days' notice in accordance with Rule 50.

OPINION.

TRAMMELL: The Commissioner disallowed the amount set up on the books of the taxpayer as being the cost of patents acquired to the extent of $10,000, upon the ground that the taxpayer had originally deducted the expenditures made in the development of patents as expense, and upon the further ground that it was not shown that an expenditure to the extent of $10,000, which was capitalized upon the books of the taxpayer, had been actually made in acquiring said patents.

We think the evidence establishes the fact that the amount claimed as capital expenditures in acquiring the patents was actually expended for that purpose. The patents had been in the process of development for a long period of years beginning prior to 1913. The taxpayer had seven men who devoted at least one-half of their time in the development of the improvements and the patent ideas. The actual expenditure attributable to patents was at least the amount claimed by the taxpayer.

With reference to the question as to whether the taxpayer should be permitted to capitalize expenditures in the development of patents which had previously been deducted as an ordinary and necessary expense, we held, in the *Appeal of Union Metal Manufacturing Co.*, 1 B. T. A., 395, that the provisions of the statute with reference to depreciation deductions was not in the alternative, and the fact that a taxpayer had not taken depreciation on patents but had permitted its invested capital to remain intact, would not prevent it from subsequently claiming the depreciation which had actually been sustained. The same is true with reference to the capitalization of patents. If the amounts expended were actually paid out in acquiring patents, the deduction of such amounts as ordinary and necessary expenses of carrying on a trade or business was not proper. The fact that a taxpayer did deduct such items or considered them as expenses does not alter the situation. Such treatment was erroneous. The taxpayer has no option to treat expense items as capital or capital expenditures as ordinary and necessary expenses of carrying on a trade or business and had a right, as it did, to change its erroneous accounting methods. The patents, when acquired, formed a part of the capital investment of the taxpayer and the costs thereof were not ordinary and necessary expenses of carrying on its trade or business. The amount of $10,000 set up by the taxpayer on its books on August 31, 1915, is as much a part of the cost of patents as the attorneys' fees or other expenses incurred in the actual procurement of said patents.

With respect to the debt of McKinley, alleged to have been ascertained to have become worthless in 1918 and for which a deduction in that year is claimed, the Board is not convinced, from the facts, that the said debt was ascertained to be worthless in that year. McKinley signed an affidavit in which he stated that on February 1, 1915, he was connected with the Gilliam Manufacturing Company and about that date secured $10,000 from the company; that this amount was immediately turned over to B. T. Steiner and that he

had no knowledge as to whether it was retained by him or turned back to the company. After the discovery of the fact that McKinley had secured the money from the corporation he surrendered the stock which he had purchased and gave securities to guarantee the payment of the amount due by him. He was retained in the employ of the company until 1918 when he resigned. When he left the company all of the securities which he had given, including the land, were turned back to him. There is no evidence that the securities which were given back to him were worthless or that the taxpayer corporation made any effort to realize on such assets before they were turned back to McKinley or to ascertain the value thereof. There is no evidence that the assets given as security were not sufficient to save the taxpayer from loss if it had undertaken to realize thereon. A taxpayer is not permitted voluntarily to surrender securities not known to be worthless and given for the purpose of protecting it from loss on an indebtedness and charge off the debt. The fact that McKinley surrendered the stock on which he had paid $10,000, the fact that all the property which he had given for the purpose of indemnifying the taxpayer against loss was surrendered to him voluntarily when he left the company, and the fact that the taxpayer had no knowledge as to the value of the assets and made no effort to realize thereon, lead the Board to the conclusion that there was no actual bona fide debt existing when the amount was charged off on the books. The taxpayer is, therefore, not entitled to a deduction on account of a debt ascertained to be worthless.