## CANISTER CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 9422.

Circuit Court of Appeals, Third Circuit.

Argued Dec. 19, 1947.

Decided Jan. 20, 1948.

Clarence E. Dawson, of Washington, D. C., and Robert L. Merritt, of New York City (Weston Vernon, Jr., of New York City, on the brief), for petitioner.

L. W. Post, of Washington, D. C. (Theron Lamar Caudle, Asst. Atty. Gen., Helen R. Carloss and Robert N. Anderson, Sp. Assts. to the Atty. Gen., on the brief), for respondent.

Donovan Leisure Newton & Irvine, of New York City, for Gould & Eberhardt, Inc.

Before BIGGS, GOODRICH and O'CONNELL, Circuit Judges.

GOODRICH, Circuit Judge.

The taxpayer's present controversy with the Commissioner of Internal Revenue presents a question under the sometimes difficult excess profits tax provisions. Int. Rev.Code, § 710 et seq., 54 Stat. 975–998, 26 U.S.C.A. Int.Rev.Code, § 710 et seq. But the immediate item of dispute presents a single issue which can be simply and clearly stated. The taxpayer makes a claim, disputed by the Commissioner, under § 719 of the Internal Revenue Code which has to do with "borrowed invested capital". If it can maintain its claim, the settlement of the dispute becomes automatic; if it loses, its liability is simply a matter of arithmetic.

The legal question arises under § 719(a) (1). The critical language, for our purposes, is that "borrowed capital * * * [is] * * * (1) The amount of the outstanding indebtedness * * * of the taxpayer which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust, * * *." Did the taxpayer have, as it claims, such an outstanding indebtedness?

The taxpayer is a manufacturer. In the fiscal year under consideration it made two contracts with he United States to manufacture certain machines to be used for war purposes. By the contract, dated March 2, 1942, the taxpayer agreed to manufacture and deliver to the United States Naval authorities certain specified goods, the purchase price of which was $3,654,-200.[1] The Government, by the same contract, agreed to "advance to the contractor a sum not to exceed 30% of the contract price to facilitate the performance of the contract * * *." Then the agreement provided, further, that "The funds advanced will be liquidated by crediting 35% of each payment becoming due under the contract to the advance until the full amount of the advance is liquidated." There was a further paragraph stating that in case of default by the contractor or termination of the contract before liquidation of the advance, the portion of the advance which remained unliquidated should be refunded to the Government.

As provided in the contract a bond was furnished.[2] The bond, which bears the name "Advance Payment Bond" bore the statement of a penal sum of $1,096,300. This was executed by the taxpayer as principal with six different surety companies as sureties for various amounts. These are the basic facts out of which our legal question is built. So far as we know, performance of both contracts went on as specified and there was no occasion for any return of the money advanced except as it was paid off by delivery of the goods promised and, consequently, there was no demand upon any of the sureties.

The taxpayer contends that the advance made by the Government under the

[1] The first contract was executed on August 7, 1941, and it, too, provided for the manufacture and delivery of certain machines to be used in the war. That contract and the arrangements for advances to be made thereunder were similar to the March 2, 1942, transaction. The main difference was that the advances were to be liquidated by crediting 30% of each payment due the manufacturer instead of the 35% credit prescribed in the later contract. The court below and the parties in this Court thought that both transactions have the same effect taxwise. We use the second transaction around which to revolve our legal analysis because we think it permits us to demonstrate in a clearer manner those factors, common to both transactions, which we think are dispositive of this case.

[2] In the August 7, 1941, transaction there were two bonds. One was for performance and was for 5% of the contract price, or $93,400. The other bond, which also bears the heading "Performance Bond" which the taxpayer properly calls a "Repayment Bond" bore the statement of a penal sum of $559,900. Taxpayer explains that the Government used the "Performance Bond" form because this was the only form available at that time to the Government authorities. On April 29, 1941, Congress modified the Miller Act, which provided that a performance bond had to be furnished on contracts of this nature, so as to provide that such bonds could be dispensed with in the discretion of the Secretary of the Navy, 55 Stat. 147, 40 U.S.C.A. § 270e. The procurement officials, therefore, did not require a performance bond in connection with the March, 1942, contract.

terms of the contract constituted "borrowed capital" under § 719(a) (1) of the Internal Revenue Code. For it to prevail, it is clear that two requirements must be met. The first is that the advance constituted an "outstanding indebtedness". The second is that such "outstanding indebtedness" was evidenced by one of the seven types of documents specified in clause (1) of the Section. Both requirements must be met; it is not a valid argument here to say that one has something just as good.[3] As to the first point, the Tax Court concluded that "By the terms of the contract the payments with which we are concerned were advance payments under the contract and not loans."[4]

█ Is this a conclusion which a Circuit Court of Appeals may review? The taxpayer gallops over the difficulty by calling the question here a question of law and the Commissioner does not argue for the full force of Dobson but simply suggests that we should accord the Tax Court's decision considerable weight. But to us the question is very much like that involved in Commissioner v. Scottish American Inv. Co., 1944, 323 U.S. 119, 65 S.Ct. 169, 89 L.Ed. 113. In that case the question was a conclusion to be drawn from certain evidentiary facts which were not themselves in dispute. That is the situation here. We have a contract which sets out at length a transaction between a buyer and a seller in which the buyer, in order to expedite production of the goods, advances some money. The conclusion that this advance is pre-payment of part of the contract price instead of a loan seems to us like one of those conclusions which the Supreme Court has told us the Tax Court should draw and that we should not interfere with if there is any sense in the conclusion reached. Cf. Dobson v. Commissioner, 1943, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248.

█ We do not have to rely exclusively on this point, however. Nor do we need to come to grips with the question suggested by our brethren in the Sixth Circuit that perhaps recent legislation has changed the status of a Tax Court decision. Cf. Dawson v. Commissioner, 6 Cir., 1947, 163 F.2d 664; Lincoln Elec. Co. v. Commissioner, 6 Cir., 1947, 162 F.2d 379. Assuming that the judicial review here was broad enough to determine whether the Tax Court's decision is supported by substantial evidence, we should have to conclude that it must be affirmed. Here is a taxpayer who is a stranger to all Government operation except as it is called upon to furnish goods for use in the conduct of a war. An advance is made with, first, a provision as to how the money is to be placed at its disposal when it needs it in producing the goods ordered. Second, arrangement is made that as it invoices goods delivered under the contract, 35% of the invoice price is to go to liquidation of the advance. Then there is a general provision for paying back the money as the contract is terminated or the seller is in default. We think that a conclusion that this transaction is to be characterized as an advance of the purchase price rather than as a loan is a conclusion which is backed by a rational analysis of the transaction. We are not, therefore, at liberty to disturb it whether we, ourselves, would have reached the same conclusion on the same facts or not.

What has been said would be sufficient to support the conclusion of the Tax Court. But there is another point on which it may be rested and any one interested may take his choice as to which is the stronger.

It is not claimed by the taxpayer, and hardly could be claimed with any show of plausibility, that the original contract between the United States, through its Navy Department, and the taxpayer constitutes the kind of evidence of indebtedness specified in the statute. Cf. Consolidated Goldacres Co. v. Commissioner, 10 Cir., 165 F. 2d 542. What the taxpayer claims is that the advance payment bond is a sufficient "bond" to be within the terms of § 719(a)

---

[3] It has been held that the absence from the statute of such words as "any other written evidence of indebtedness" indicates a Congressional intent that an approximation is not good enough. Flint Nortown Theatre Co. v. C. I. R., 1945, 4 T.C. 536, 538; Journal Publishing Co. v. C. I. R., 1944, 3 T.C. 518, 522.

[4] 1946, 7 T.C. 967, 973.

(1). That bond is a surety bond in the ordinary form with the taxpayer as principal and the various surety companies as sureties. But that bond is not an unconditional promise to pay money. The penal sum is "* * * to save the Government harmless against any or all losses which may result from the failure of the Principal to liquidate * * * or repay to the Government all or any portion of the advance payment so made." It contains the usual provision that if the principal .debtor does what is promised, that is to liquidate his advance payments, "then this obligation to be void." We think the bond is just what it purported to be, a surety bond, and was executed for the performance of the principal obligation which was contained in the elaborate bilateral contract executed by the taxpayer and the United States.

In this connection it is interesting to examine the requirements concerning this bond as set forth in the contract of the parties. It is there provided that regardless of the amount advanced the sum of the required bond is 30% of the purchase price of the goods manufactured under the contract. Thus, as taxpayer itself points out, an advance of but 5% of the purchase price requires a bond in the amount of 30% of the purchase price. There is no relationship, therefore, between the sum named in the bond and the amount of money advanced. The possible limit of recovery by the Government on the bond for the "losses which result from the failure of the Principal to liquidate or repay the Government" may be in excess of the money advanced. And the undertaking on the bond, as required by the bilateral contract, is to stand good for such loss up to 30% of the contract price of the goods.[5] This demonstrates to us that the bond is not evidence of an "outstanding indebtedness" of the taxpayer, but rather is a security bond to protect the Government against a contingent future loss.

This was the view of the Tax Court when it said that the bond "was only evidence of a penalty for failure to perform under the contract." There is no confusion about it in the Tax Court's mind and we think the conclusion reached was correct.

The decision of the Tax Court will be affirmed.

---

[5] Furthermore, the bond issued in connection with the August 7, 1941, contract provided that "in case the material covered by said Contract * * * should not be manufactured and delivered by the principal in accordance with the provisions of the Contract, and if the principal fails to reimburse the Government in the amount due in the sum or sums paid by the Government to the principal, the surety on the bond shall be liable to the Government for the amount thereof."