## MAHONEY MOTOR CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 14305.

United States Court of Appeals
Eighth Circuit.

Nov. 20, 1951.

James W. R. Brown, Omaha, Neb. (James J. Fitzgerald, Jr. and Seymour L. Smith, Omaha, Neb., on the brief), for petitioner.

Edward J. P. Zimmerman, Special Asst. to the Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack and A. F. Prescott, Special Assts. to the Atty. Gen. on the brief), for respondent.

Before GARDNER, Chief Judge, and THOMAS and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

Review is sought of a decision of the Tax Court, 15 T.C. 118, which upheld assessments of deficiencies made by the

Commissioner of Internal Revenue in the taxpayer's excess profits taxes for the calendar years 1944 and 1945, in the amounts of $8,377.85 and $11,319.76 respectively.

The deficiencies arose out of the Commissioner's disallowance of the taxpayer's use for credit purposes, in computing the amount of its excess profits taxes, of some bank borrowings aggregating $400,-000, which the Commissioner refused to recognize as constituting "borrowed invested capital" within the meaning of section 201 of the Second Revenue Act of 1940, as amended, Int.Rev.Code § 719, 26 U.S.C.A., and of section 35.719-1 of Treasury Regulations 112, 26 C.F.R.(Cum.Supp.) § 35.719-1.

The borrowings had been regularly made and evidenced by promissory notes; the proceeds were invested in Government bonds and Treasury notes, which were used to collateralize these obligations; and the purchases of such securities had resulted in profits and taxable income to the taxpayer, from interest received on them above the rate paid on its borrowings and from appreciation which had occurred in their value, in a total amount of $22,351-.64.

The taxpayer, an Iowa corporation, with its place of business located at Sioux City, was the holder of a Ford automobile dealer's franchise and was engaged generally in buying, selling, financing and dealing in cars, trucks, parts and accessories. Its articles of incorporation authorized it, in addition to conducting a general automobile business, to carry on, "in the discretion of the directors * * * from time to time * * * any other lawful business, manufacture, or otherwise, to any extent or in any manner not unlawful." It also was expressly empowered to issue promissory notes and other evidences of indebtedness, both secured and unsecured.

For a number of years preceding the time here involved, the corporation had been in a weak financial condition and unable to obtain any bank credit, so that it had had to do the financing necessary for its operations through a commercial finance company. This method of financing re-

quired it to pay a substantially higher interest rate than it would have had to do on a bank loan. The working funds so obtained also had less fluidity, in that, unlike a bank loan, where the loan was general, where the security was entire, and where the whole obligation had a certain maturity date, the finance company made separate allocations of funds or loans against individual units of security, with the result that these divided loans might become due at any time and the corporation would have to be in a position to pay them off, as sales occurred of the particular units of security. The corporation had been working toward the day when it would be able to obtain bank financing, for the further reason that this would make it possible also for it to carry its own credit-sales paper—a profitable aspect of the retail automobile business which it had had to forego, in its need to assign such paper to the finance company for obtaining operating capital, although it still was left subject to the risk thereof, by virtue of the secondary liability which the repurchase agreement demanded by the finance company imposed upon it. And beyond this, it was the business judgment of the officers and directors of the corporation that a direct handling by the corporation itself of its credit-sales paper, with the occasioned regular traffic of installment-payers' through its salesrooms, would be productive too of sales of parts, accessories, services and new-model cars.

During the year 1943, the taxpayer's financial condition had become materially improved. Its board of directors thereafter, in January, 1944, adopted a resolution to the effect that the corporation should establish, use and maintain lines of credit with various banks in Sioux City and elsewhere to the end that it might develop credit standing and reputation and be eligible for credit from such banks in relation to the financing and carrying by it of its own credit-sales paper; that the officers of the corporation were authorized to take steps to put such a plan of handling credit-sales paper into effect; and that the corporation should currently borrow from banks up to an aggregate

amount of $500,000, on promissory notes, and make purchases of Government bonds therewith, to be pledged as collateral for the notes, and should "repeat such borrowings and purchases from time to time, so long as the operation is and remains a profitable one."

Borrowings thus were applied for and obtained from three Sioux City banks, through the course of the months immediately following, in a total amount of $400,000, and renewals were periodically made of the note obligations given therefor, until 1946, when, shortly before a market decline in Government securities, all of the bonds were sold and the notes paid off. The corporation had, however, during the period that the loans were in effect, made some reductions in principal on the notes, out of the operating profits from its automobile business, in an aggregate of $20,000.

Up to the time though of the hearing before the Tax Court in January, 1950, the taxpayer had continued as before to do such financing as its operations required, through the finance company with which it had been previously dealing, but the record indicated, and the Tax Court found as a fact, that during these intervening years, from 1944 to 1949 inclusive, the corporation relatively had not had much need for financing, (a) because of the limited number of new cars which were then being manufactured, and (b) because purchasers of used cars were generally throughout that period able to pay cash or to obtain bank loans personally at a lower interest rate than it would have cost them to do their financing through the automobile dealer. It was however shown that facilities had in fact been set up by the taxpayer in 1949, through a remodeling of its showroom and offices, for the handling of its credit-sales paper and the installment payments thereon, when the time should become opportune for it to commence this activity.

All of the facts set out above have been taken from the findings which the Tax Court made. Notwithstanding these facts, the Tax Court concluded that the Commissioner had been right under the statute[1] and the regulation,[2] in refusing to allow the taxpayer to use the bank borrowings referred to, for credit purposes, as representing in any way "borrowed invested capital".

The Tax Court held that, while the borrowings manifestly had been made for the purpose of producing profit and of establishing bank credit as an aid to future operations, this was not sufficient to make the funds constitute "borrowed invested capital" in the circumstances of the situation. Its opinion declared that, under the provision of the regulation, that such incurrings of indebtedness "must be * * * for business reasons", borrowings were not eligible to be used for credit purposes un-

---

1. Int.Rev.Code, § 719.

"(a) Borrowed capital. The borrowed capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following:

"(1) The amount of the outstanding indebtedness (not including interest) of the taxpayer which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust, * * *.

* * * * *

"(b) Borrowed invested capital. The borrowed invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be an amount equal to 50 per centum of the borrowed capital for such day."

2. Treas.Reg. 112, § 35.719–1.

Borrowed Invested Capital.—The borrowed invested capital for any day of the taxable year is 50 percent of the borrowed capital for such day determined as of the beginning of such day. Borrowed capital is defined to mean:

(a) Outstanding indebtedness (other than interest, but not including indebtedness assumed or to which the taxpayer's property is subject) of the taxpayer which is evidenced by a bond, a promissory note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust, * * *

* * * * *

In order for any indebtedness to be included in borrowed capital it must be bona fide. It must be one incurred for business reasons and not merely to increase the excess profits credit. * * *

less the funds had been made "a part of the taxpayer's working capital and subject to the risk of the taxpayer's business;" that, even though such borrowings were engaged in for purposes of profit-making, the funds could not be said to have become a part of the taxpayer's working capital and subject to the risk of the taxpayer's business, if the profit-making operations in which they were used were casual or collateral undertakings as distinguished from the corporation's normal or regular activity; that in the present situation the taxpayer's venture into the securities-investment field "was a purely collateral undertaking so far as its automobile dealer business was concerned" and "the borrowings were at no time placed at the risk of the automobile dealer business," so that the taxpayer's profit-making motive and undertaking in relation to the borrowings were not "business reasons" within the purview of the regulation; and that equally the taxpayer's further object of establishing credit lines with banks, through the initiation of borrowing transactions, as a foundation for future general financing, was not "business reasons" under the regulation, for lack of substantiality, in that "whether the borrowings here in question would have materially helped petitioner to attain that result is questionable" and "furthermore, the fact that petitioner has never had lines of bank credit in its business, either before or after the transaction here involved, indicates that, however desirable, such lines of credit were certainly not essential to petitioner's business."

█ The provision of the regulation that is here involved obviously was an attempt to give a practical focus, within reasonable legal, commercial and administrative perspective, to the expression "outstanding indebtedness", in its immediate statutory use, Int.Rev.Code § 719(a)(1). The term "indebtedness" is one of broad content, so that its use legislatively will ordinarily involve possible irrelevancies of general connotation as to a particular stat-

utory field. As a statutory expression, therefore, it "lacks the fixed import of a word of art", Commissioner v. Tennessee Co., 3 Cir., 111 F.2d 678, 679, and so "must be construed in every case in accord with its context", 42 C.J.S., Indebtedness, p. 555. Attempted administrative clarification or definition of its relevant scope in relation to the present statute was accordingly not legally improper. And it cannot judicially be said that, in providing that "In order for any indebtedness to be included in borrowed capital it must be bona fide" and "It must be incurred for business reasons and not merely to increase the excess profits credit," the regulation was on its face either irrelevantly or capriciously unreasonable and invalid. Even without the regulation, a court would hardly be likely contextually to view the statute as entitling any borrowings of a corporation to be used for excess profits credit which had not been made for purposes of corporate enterprise or activity but for some extraneous purpose, such as, for example, to enable the corporation merely to make an accommodation loan to one of its officers.

█ It is not possible therefore to accept the taxpayer's broad contention here that the language of the statute is of such legislative absoluteness as to require administrative and judicial recognition of every borrowing of money by a corporation, evidenced in a form designated by the statute, no matter for what purpose made, as constituting "borrowed capital" for purposes of "borrowed invested capital" taxcredit. Re-emphasizing what has been pointed out above, the regulation in the portion here involved undertakes only to deal with what nature or character of "outstanding indebtedness" may properly be regarded as being reflective of "borrowed capital" within the setting and object of the statute. It does not, as the taxpayer argues, seek to disturb the automatic relationship between "borrowed invested capital" and "borrowed capital", which the statute itself has fixed.[3]

3. Under Int.Rev.Code § 719(b), "The borrowed invested capital for any day * * * shall be an amount equal to 50 per centum of the borrowed capital for

such day." As Senate Report No. 2114, Committee on Finance, 76th Cong., 3rd Sess., sec. 719, p. 14, declared, "Under the bill as reported by your committee,

512

■ Without need to discuss the question further, on the reasons which we have stated, we adhere to and reaffirm our holding in Hart-Bartlett-Sturtevant Grain Co. v. Commissioner, 8 Cir., 182 F.2d 153, 158, that the portion of the regulation here involved is not invalid as being beyond or in conflict with the provisions of the statute.[4]

■ The only remaining question then is whether the Tax Court made a reasonable or an unwarranted construction and application of the regulation in the situation.

The Commissioner, as a basis for assessing the deficiencies involved, took the broad position, in his letter or notice to the taxpayer, that "money borrowed and used to purchase United States Government bonds may not be included in borrowed invested capital for the purpose of computing the excess profits credit." This unqualified view, that corporate borrowings to purchase Government securities can not at all be regarded as "borrowed capital" indebtedness within the statute for purposes of "borrowed invested capital" credit, seems to have been made the basis of deficiency assessments by the Commissioner in other cases also, but it has not been thus generally and abstractly accepted by the Tax Court. See Globe Mortgage Co. v. Commissioner, 14 T.C. 192. And the Commissioner does not undertake to urge that absolutism here.

Nor would such a flat rejection of purchases of Government securities on money borrowings, without regard to any corporate purpose that the purchases might serve, appear to comport in concept with the legislative recognition made, in Int. Rev.Code § 720(a) (2), 26 U.S.C.A. § 720 (a) (2), of such securities as "admissible assets" in relation to "invested capital" generally, under §§ 715–717, 26 U.S.C.A. §§ 715–717, where the interest on them is not excludible from gross income or not allowable as a credit against net income, and with the privilege accorded a taxpayer under § 720(d) of having even those on which the interest may be tax-exempt treated as "admissible assets" in relation to "invested capital", for purposes of computing excess profits credit under § 714, 26 U.S.C.A. § 714, by the inclusion of such interest in its normal-tax net income.

As we have suggested, the Tax Court has previously recognized, in Globe Mortgage Co. v. Commissioner, 14 T.C. 192, that borrowings made to purchase Government securities can, where the purchasing has been engaged in for adequate "business reasons," represent such character of "outstanding indebtedness" as will constitute "borrowed capital" for purposes of "borrowed invested capital" credit.

The Tax Court undertook for purposes of distinction to summarize the Globe Mortgage Co. case in its opinion in the present case, as follows: "In the Globe Mortgage Co. case, supra, the taxpayer, a corporation engaged in the general investment and finance business, was accustomed to borrowing large sums from the banks to finance its business investments. When, as a result of war-time building restrictions, the taxpayer became unable to obtain sufficient mortgage loan investments, it used its available credit to borrow substantial amounts from banks to purchase U. S. Government securities, depositing the securities purchased, together with additional cash, with the banks for collateral. It was to the taxpayer's interest to maintain the level of its borrowings from the banks in order to keep open its available credit lines with them. Also, the taxpayer had for several years made investments in corporate and Government securities in its business. Upon the liquidation of this investment in U. S. Government securities,

---

all borrowed capital, as defined in the House bill, is includable in invested capital at 50 per cent." But "outstanding indebtedness" for money borrowed does not under the regulation give rise to "borrowed capital" within the use of that term in the statute, if it was not "incurred for business reasons."

4. As a matter of fact, in the subsequent

Excess Profits Tax Act of 1950, 64 Stat. 1137, 26 U.S.C.A. § 430 et seq., Congress substantially enacted this portion of the regulation directly into the statute, by providing, 64 Stat. 1161, 26 U.S.C.A. § 439(b) (1), that "outstanding indebtedness" in order to constitute "borrowed capital" must be "incurred in good faith for the purposes of the business".

the taxpayer realized a net profit of $115,-669.37. This Court * * * concluded that the borrowings in question were for business reasons and that the amounts borrowed were includible in the taxpayer's borrowed invested capital under section 719."

It will be noted that in both the Globe Mortgage Co. case and the present situation, the bond-buying activities of the corporation were engaged in as profit-making ventures, and in both instances substantial profits had in fact been made with ensuing taxability under the statute. Also, in the Globe Mortgage Co. case, the borrowings had had the further express purpose of seeking to keep open the corporation's existing credit lines for future operational needs, and in the present case the taxpayer was striving, with equal good faith, through the borrowings made, to open up lines of bank credit so that it might be in a position, as the Tax Court said, at some time in the future to "end its reliance on automobile finance companies for credit" and to "do its own automobile financing."

But the Tax Court refused to regard these similarities as establishing any legal identity of "business reasons" in the two situations. It said that the principle of the Globe Mortgage Co. case was not applicable in the present case because of the following distinctions: "Here petitioner was an automobile dealer. It was not in the investment business. There is nothing in the record to show that it had ever invested in Government securities or any other securities [5] before 1944, when the securities herein were purchased, or after 1946, when they were sold, or that it had ever borrowed from banks before 1944, or after 1946. The program of borrowing from banks and investing in Government securities here embarked upon by petitioner was a purely collateral undertaking so far as its automobile dealer business was concerned. The borrowings were at no time placed at the risk of the automobile dealer business, but were used to buy Government obligations and secured by the obligations purchased. It is obvious that this factual situation is considerably different from that in Globe Mortgage Co., supra, where this Court concluded from the facts: '* * * that the petitioner borrowed the sums here in question and used them to purchase Government securities in the normal course of its business as bona fide transactions, subjecting the borrowed capital to business risks for profit.'"

And in equal measure, said the Tax Court, the attempt of the Globe Mortgage Co. to keep its established credit lines open was distinguishable as "business reasons" from the taxpayer's effort here to open up bank credit, as a matter of substantiality, in that "the development and maintenance of large credit lines were essential to (Globe Mortgage Co.'s) business operations," but "whether the borrowings here in question would have materially helped petitioner to attain that result is questionable;" moreover, "at the time of the hearing in January 1950, petitioner had not yet established lines of bank credit and was still financing its automobile sales through an automobile finance company, as it had always done;" and, beyond this, "however desirable (bank credit might have been), such lines of credit were certainly not essential to petitioner's business."

Thus, at least in so far as the distinctions which it drew between the Globe Mortgage Co. case and the present situation are concerned, the effect of what the Tax Court said was that the phrase, "for business reasons," in its application to borrowings of a corporation, required, for purposes of the statute, (a) a scrutiny and grading of the corporation's activities and operations, without regard to the fact that each might have been engaged in for profit-making purposes and under authority

5. The record shows that the taxpayer at all times since 1939 had been carrying some notes and mortgages taken from automobile purchasers, because "questionable paper" always existed which the finance company would not discount. Also, the findings of the Tax Court recognized the good-faith aspiration and attempt of the taxpayer to get itself into a position prospectively where it could handle all of such paper personally without being obliged to discount it to a finance company.

of the corporation's charter,[6] into primary or collateral undertaking, regular or special venture, established or departive enterprise, and (b) a weighing of any other "business reasons", as considerational factors, which might underly the borrowing, on the basis of their substantiality in the situation.

We are unable to see how the phrase, "for business reasons", in the regulation can be viewed as affording any rational basis for such a distinction between charter-authorized and engaged-in-for-profit activities of a business corporation, as the Tax Court undertook to make. Elementarily, in natural or commercial or legal concept, all of a corporation's authorized, profit-pursuing endeavors are within its "business." Nor does such an artificial classification of corporate operations find support legislatively in the taxing scheme of the statute, for the fruit of each business or profit-making activity of the corporation falls equally under the tax collector's hand. And such a partial exclusion of borrowings made for the conduct of business operations would seem to ignore the clear intent of Congress, while reaching at the "abnormally high profits due to large governmental expenditures about to be made from appropriations for national defense", Commissioner v. South Texas Co., 333 U.S. 496, 497, 68 S.Ct. 695, 696, 92 L.Ed 831, to still not close the door, in a projective fostering of the national economy, to incentive and opportunity for corporate expansion and increase of commercial activity.

Also, it should be remembered that a simple practical check was provided by the regulation itself as to all corporate enterprise, old and new alike, engaged in on borrowings made, in that it had to be in good faith and that indebtedness could not constitute "borrowed capital" for purposes of the statute if it was incurred "merely to increase the excess profits credit."[7]

Beyond the distinctions which it purported to make between the Globe Mortgage Co. case and the taxpayer's situation, the Tax Court undertook also to rest its decision upon our opinion in Hart-Bartlett-Sturtevant Grain Co. v. Commissioner, 8 Cir., 182 F.2d 153, affirming 12 T.C. 760.

In that case, as here, the taxpayer had attempted to use borrowings made to purchase Government bonds, for "borrowed invested capital" credit. It was admitted, however, by the taxpayer that the purchases had not been made as an investment activity for profit-making purposes. No profit was intended and none was realized from the purchases. The taxpayer was engaged in the business of buying and selling grain at elevators owned by it in 54 localities. The buying end of its business was highly competitive, and it therefore regarded it as desirable to cultivate good will in the community. To this end, it made subscriptions for war bonds in each of the localities where it operated, to help the community attain or exceed its quota for any drive. It borrowed the money to pay for the bonds, using the bonds to collateralize the notes which it gave. The interest rate on the notes and on the bonds was substantially identical. It liquidated the notes by selling the bonds. It had no other purpose in making the bond purchases, except to have the fact of each purchase become known in the community, with the hope that this would foster good will. When the publicity had been achieved, the purchase had fully served its purpose. Both the Tax Court and this Court regarded this as being neither sufficiently direct nor substantial in nature to have made the borrowings "for business reasons", within the meaning of the regulation and the purpose of the statute.

---

6. Here the corporate power of the taxpayer to enter the securities-investment field for profit and to borrow money with which to engage in that activity, under authorization from its board of directors, is not questioned.

7. The Tax Court did not purport to make any finding here that the taxpayer's venture into the investment field was not undertaken as a good-faith business activity for profit-making purposes or that the indebtedness had been incurred merely to increase excess profits credit.

In summarizing the situation in the Hart-Bartlett case, our opinion declared: "The sums borrowed were never actually invested as part of petitioner's working capital, they were never utilized for the earnings of profits and they were never subject to the risk of petitioner's business." 182 F.2d at page 158. The Tax Court in undertaking to apply this language to the present situation said that, while here "the sums involved were utilized for the earnings of profits," they had not "been a part of the taxpayer's working capital and subject to the risk of the taxpayer's business."

But only by adoption of the premise that the taxpayer's bond-investment activity was not entitled to be recognized as "business reasons" was it possible to hold that the borrowings involved were not working capital in the business or subject to the risk of the business. Certainly, money needed and directly employed to carry on any proper profit-making operation or activity of a commercial corporation is in normal concept working capital in the business and subject to business hazard. And, as we have held above, no rational basis exists for viewing the language of the regulation as not treating all of such operations or activities as corporate business but as recognizing a borrowing of money with which to carry on one of such operations or activities as made for "business reasons" while not so recognizing a similar borrowing with which to carry on another, although the latter equally constitutes a charter-authorized, good-faith, commercial operation or activity.

Also, it may be noted that the Globe Mortgage Co. case itself recognized that borrowings used to purchase Government securities, where the purchases were made as an investment undertaking of the corporation, constituted working capital and were subject to business risk. To this may be added the observation that the investment operations of the taxpayer here in Government securities could hardly any less have been subject to the possibility of depreciation or loss of market than those in the Globe Mortgage Co. case.

We pointed out above that the Tax Court had given consideration also to whether the attempt of the taxpayer, through the borrowings made, to establish bank credit, as an aid in future operations, had constituted "business reasons", and had appraised this ground as not being sufficiently substantial in the situation. Whether it is at all possible for borrowings made for purposes other than direct use in immediate-profit activity to have such substantiality as to entitle them to be treated as having been "for business reasons", within the purview of the regulation, it is not necessary, in view of the result reached, for us to consider.

For the reasons which have been set out, the decision of the Tax Court is reversed.