## COMMISSIONER OF INTERNAL REVENUE v. HUNT FOODS, Inc.

### No. 13362.

United States Court of Appeals Ninth Circuit.

May 20, 1953.

Ellis N. Slack, Acting Asst. Atty. Gen., Lee A. Jackson and Maryhelen Wigle, Sp. Assts. to the Atty. Gen., Charles W. Davis, Chief Counsel, Bureau of Internal Revenue, Washington, D. C., Howard Locke, Sp. Asst. to the Atty. Gen., for appellant.

Dempsey, Thayer, Deibert & Kumler, Arthur H. Deibert, William N. Greene, Los Angeles, Cal., for appellee.

Before ORR, Circuit Judge, and LING and BYRNE, District Judges.

LING, District Judge.

This is a petition by the Commissioner of Internal Revenue for review of a decision of the Tax Court which failed to sustain his determination of certain deficiencies in the respondent's excess profits taxes for the years 1941 and 1942. The facts are not in dispute.

The legal questions arise under former Section 719(a) (1) of the Internal Revenue Code, 26 U.S.C.A. § 719, which in pertinent part, is that "borrowed capital * * * [is] * * * The amount of the outstanding indebtedness * * * of the taxpayer which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust, * * *". Did the Tax Court err in holding that taxpayer had such an outstanding indebtedness evidenced by bills of exchange?

Taxpayer, a California corporation, is engaged in the business of packing fruits and vegetables. Its products are widely marketed throughout the United States. During the fiscal years ended February 28, 1941 and 1942, it obtained funds in connection with its operation in the following manner:

When goods were shipped to a customer, a sight draft would be drawn on such customer, payable to taxpayer. Upon payment of the draft the customer took possession of the goods. These drafts, with bills of lading attached, were delivered to taxpayer's bank. As part of the transaction a deposit slip was delivered which showed the amount of the face of the draft as a deposit.

Upon receipt of the draft and deposit slip taxpayer's bank, on its books, credited taxpayer's checking account and charged taxpayer's loan liability account. On its own books, taxpayer charged its account showing cash on deposit in its banks and credited an account entitled, "Discounted Drafts Account". The bank thereafter transmitted the draft and shipping documents to a bank in the customer's vicinity for collection. The collecting bank forwarded the amount collected to taxpayer's bank, which credited taxpayer's account with such proceeds. The bank charged taxpayer's account for interest, payable at the rate of 3½ per cent per annum for the period from the time of deposit of the draft to the time of receipt of the proceeds thereof.

Upon receipt of such proceeds the bank notified taxpayer of such receipt, the amount of discount allowed taxpayer's customer, the correspondent bank's charges and the interest to be charged taxpayer, by the bank. At that time the bank credited its account with taxpayer with the proceeds.

Taxpayer, at the close of each taxable year, prepared a schedule showing daily deposits of drafts with the banks, daily payment of drafts and the daily balance of drafts outstanding for collection. The average daily balance of drafts outstanding and unpaid during taxpayer's fiscal years ended February 28, 1941, and February 28, 1942 were $209,046.71 and $336,796.40, respectively. The Government insists these amounts should not be considered in computing taxpayer's invested capital for said years.

Lines of credit were extended to taxpayer by the Bank of America in 1941 and 1942 aggregating $3,600,000 and $3,900,000, respectively, of which $550,000 and $750,000, respectively, were for secured and unsecured sight draft advances. Such lines of credit constituted authority for bank loans against warehouse receipts, and advances by the bank against sight drafts drawn on its customers by taxpayer. Loans made on warehouse receipts were secured by promissory notes executed by taxpayer. Where advances were made on sight drafts with negotiable or non-negotiable shipping documents attached, no promissory note or written agreement evidenced the transaction. The bank relied upon the deposit slip, the credit of taxpayer's checking account with the face amount of the draft, and the custom and practice in the trade of not considering the draft paid until the proceeds were actually received. Dishonored drafts were charged against taxpayer's account.

In the Tax Court, petitioner contended that title to the drafts, when deposited, passed to the bank and were collected in its own behalf. The Court held otherwise. If the point had been maintained, obviously, the bank would have been a purchaser, not a lender, and credit advances would have been advances, not loans. The contention is abandoned here, and it is conceded that the bank was merely taxpayer's collecting agent. Nevertheless, petitioner still insists that credits advanced on the drafts were provisional advances, not loans. There is no merit in the contention.

■ No novelty exists in the arrangement had between taxpayer and its bank. It is common practice in the West in marketing livestock and crops to use drafts with bills of lading attached. Here taxpayer needed bank loans to conduct its operations. The books of account of the parties treated the transaction as loans. Interest was charged for the use of the money, and taxpayer was obligated to repay money loaned which was secured by sight drafts. The conclusion is inescapable that the amounts borrowed by taxpayer on its sight drafts represented an outstanding indebtedness.

No case has been cited which sheds any light on the situation found here, and, in the light of the foregoing undisputed facts the court's philosophy in Lynch v. Alworth-Stephens Co., 8 Cir., 294 F. 190, 194, may be apt. The court said:

"And the plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover."

The petitioner next insists that even if an outstanding indebtedness exists, it is only partly evidenced by a bill of exchange, and

therefore does not measure up to the statutory requirement that the indebtedness be evidenced by a bill of exchange. It is true that in order to prove the indebtedness, in addition to the sight draft and the deposit slip, it would be necessary to show the bank agreed to extend credit. But it is equally true that in order to prove a debt secured by a mortgage, it would be necessary to show the existence of a promissory note, or some other supporting instrument.

Congress in using the term "evidenced by" was no doubt aware of the distinction between evidence and proof. For while the words are often used interchangeably, the latter is the legal effect of the former.

In Higgins v. Commissioner, 4 T.C. 1033, the Court in construing the instant statute held contrary to the Government's second contention. The court said:

"We do not think that this conclusion follows. The statute requires that the indebtedness has to be the indebtedness 'of the taxpayer,' but it does not require that the specific type of instrument mentioned in the statute be that 'of the taxpayer.' All that the statute requires is that the outstanding indebtedness of the taxpayer be 'evidenced by' one of the specific types of instruments."

The judgment of the Tax Court is affirmed.