BURFORD–TOOTHAKER TRACTOR
COMPANY, Inc., Appellant,

v.

UNITED STATES of America,
Appellee.

No. 17151.

United States Court of Appeals
Fifth Circuit.

Jan. 29, 1959.

Fred Ball, Montgomery, Ala., for appellant.

John J. McGarvey, David O. Walter, A. F. Prescott, Joseph F. Goeteen, Attys., Dept. of Justice, Washington, D. C., Hartwell Davis, U. S. Atty., Montgomery, Ala., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Ralph M. Daugherty, Asst. U. S. Atty., Montgomery, Ala., for appellee.

Before RIVES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Emerging from the application of the Korean Excess Profits Tax Statute which " * * * probably represented the most intricate and baffling enactment ever to receive Congressional approval," 7A Mertens, The Law of Federal Income Taxation iii (Rev. ed. 1955), are two relatively simple questions in the determination of the excess profits tax credit for the tax years 1950, 1951, and 1952. The first is whether a strike at a supplier's plant

in 1946 was an extraordinary and substantial interruption of operation under Section 442(a), 26 U.S.C.A. Excess Profits Taxes, § 442(a). The second is whether funds obtained by Taxpayer from its bank under a transfer of customer's conditional installment sales contracts and promissory notes was a part. of "borrowed capital" under Section 439 (b) (1), 26 U.S.C.A. Excess Profits Taxes, § 439. The District Court on an undisputed record answered both in the negative. We disagree.

Taxpayer, an Alabama corporation, has been a dealer in heavy road building machinery and farm equipment in Montgomery, Alabama, since 1934. The Caterpillar Company of Peoria, Illinois, was the chief supplier of machines and parts, although parts and machinery of two other lines were also handled. Its annual sales aggregated two to three million dollars. On January 23, 1946, a strike occurred at Caterpillar's plant which lasted about a month.

 There is, and can be, no dispute that under the statute,[1] the regulations,[2] and analogous decisions [3] under a predecessor Act [4] a strike in a major supplier's factory is an event "unusual and peculiar in the experience of such taxpayer."

The District Court, accepting this, apparently thought that Taxpayer had failed in its burden of showing a sufficient causal relation, i. e., that the strike, in the words of the regulation, note 2, supra, brought about a significant non-trivial interruption or diminution in operations.

Two things seemed to bear heavily on this. First, under the dealer franchise arrangement, Caterpillar was not legally obligated to deliver to the dealer any machines whatsoever, whether previously allocated or not. Therefore, there was no assurance that had the strike not occurred machines would nevertheless have been delivered. Second, Taxpayer failed to show precisely what the opening inventory of machines was in February 1946, so that there was no basis for concluding that the absence of new deliveries reduced or obliterated the stock available for sale to customers.

This approach is both highly unrealistic in the frame of this record and is an impermissible inoculation of the administrative process with the metaphysical

1. Section 442(a) provides:
"If a taxpayer * * * establishes that, for any taxable year within * * its base period: (1) normal production, output, or operation was interrupted or diminished because of the occurrence * * * of events unusual and peculiar in the experience of such taxpayer, * * * the taxpayer's average base period net income determined under this section shall be the amount computed under subsection (c) or (d), whichever is applicable." Int.Rev.Code of 1939, § 442 (a), 26 U.S.C.A. Excess Profits Taxes, § 442(a).

2. Regulation 40.442–2(a) provides:
"(2) Not every interruption or diminution of normal production, output, or operation in the base period may furnish the basis for the application of Sec. 442(a) (1). The interruption or diminution must be significant and not trivial."
"(3) * * * Unusual and peculiar events contemplated in section 442(a) (1) consist primarily of physical rather than economic events or circumstances. Such physical events include floods, fires, explosions, strikes, and other exceptional and uncommon circumstances hindering production, output, or operation." (emphasis supplied) U.S.Treas.Reg. 130, § 40.442–2(a) (2) and (3) (1951).

3. United Motor Coach Co. v. Commissioner, 22 T.C. 578, 580; Pelton and Crane Co. v. Commissioner, 20 T.C. 967, 974; Schneider's Modern Bakery, Inc. v. Commissioner, 19 T.C. 763, 772; Triangle Raincoat Co. v. Commissioner, 19 T.C. 548, 560.

4. See Section 722 of the World War II Excess Profits Tax, added by Section 201, Second Revenue Act of 1940, c. 757, 44 Stat. 974, and amended by Section 222 (a), Revenue Act of 1942, c. 619, 56 Stat. 798. While the basic approach of Section 722 was to test the impact of the event on probable *earnings,* and not, as in Section 442, note 1, supra, simply on the more tangible matter of production or operations, see S.Rep. No. 2679, 81st Cong., 2d Sess. 17–18 (1950), the event under both Acts was described as "events unusual and peculiar in the experience of such taxpayer * * *."

subjective imponderables in old Section 722 which Congress rejected as unworkable and unfair when, for the Korean Excess Profits Tax Bill, an automatic objective formula was prescribed. See note 4, supra.

This record, by irrefutable proof of the highest order, showed that in the six months preceding the strike Taxpayer received deliveries from Caterpillar averaging over $60,000 per month. Those in the seven months following the strike averaged over $53,000. On the other hand, in February the deliveries were zero, and in March only 61% of the previous average.

Congress did not mean to write into this objective formula any legal casuistry. It was dealing with the very practical matter of taxes in practical day-to-day business operations. The test was simply: did the exceptional event cause a substantial non-trivial interruption or diminution in every day operations? That, in turn, was to be determined in a practical way on practical business probabilities. In this light, with no explanation other than the strike for the sudden and complete cessation of deliveries, followed by normal resumption in the succeeding months, it is artificial to reason on rigid notions of proximate cause that the strike did not, in law, bring this about merely because Caterpillar might not have shipped a single machine for no reason at all.

The same is true of the element of inventory. The record is clear that for many years this type of machinery was in short and acute supply. Nearly every machine was sold by Taxpayer even be-

fore delivery from Caterpillar. And, in any case, continued operations of Taxpayer's business required a continuous supply of machines. That there might have been two or three pieces of Caterpillar equipment on Taxpayer's floor available for sale during the strike period does not overcome the fact that the new flow was cut off. Inventory of goods for sale is normally a revolving matter. That last month's deliveries may still be available for sale during this month of the strike does not overcome the absence of stock when next month rolls around.

The uncontradicted facts permitted but a single conclusion: in all reasonable probability had not the strike occurred Taxpayer would have received machines of at least $60,000 value which would have been sold in that or the following months. This was lost and was a substantial diminution in operations.[5]

■■ We come then to the question whether the credit transactions with the Alabama National Bank were "borrowed capital." True to form in an income tax problem, this turns on the subsidiary question whether this was "outstanding indebtedness * * * of the taxpayer * * * evidenced by a * * * note, * * * bank loan agreement * * *."[6]

The facet seized on by the Government which, in its view, destroys the status of an "indebtedness" is that, with respect to this particular credit advanced by the Bank, Taxpayer did not execute its own note. Therefore, on the surface of things, while it had a liability to the Bank to pay if the original maker defaulted, this liability was secondary and

---

5. Triangle Raincoat Co. v. Commissioner, 19 T.C. 548, and Pelton & Crane Co. v. Commissioner, 20 T.C. 967, see note 3, supra, relied on by the District Court are not to the contrary. Under Section 722 the question was whether the proof showed that the interruption from the strike reduced *earnings*, a matter far different than operations.

6. Section 439 defines borrowed capital as: "(1) The amount of the outstanding indebtedness (not including interest) of the taxpayer, incurred in good faith for the purposes of the business, which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, deed of trust, bank loan agreement or conditional sales contract. In the case of property of the taxpayer subject to a mortgage or other lien, the amount of indebtedness secured by such mortgage or lien shall be considered as an indebtedness of the taxpayer whether or not the taxpayer assumed or agreed to pay such indebtedness, plus * * *." Int.Rev.Code of 1939, § 439, 26 U.S.C.A. Excess Profits Taxes, § 439.

hence contingent. This lays the predicate for a dogged insistence on the rubric often announced that "A contingent obligation may be a liability, but it is not a debt," Guardian Investment Corp. v. Phinney, 5 Cir., 1958, 253 F.2d 326, 329, as well as the notion that the obligation, if contingent, becomes a debt only when the duty to pay becomes absolute. United States v. Virgin, 5 Cir., 1956, 230 F.2d 880; Brown-Rogers-Dixon Co. v. Commissioner, 4 Cir., 1941, 122 F.2d 347; United States v. South Georgia Ry. Co., 5 Cir., 1939, 107 F.2d 3.

But here again the overemphasis of but a single facet is an unrealistic disregard of the practical nature of the transaction by which money was *loaned,* not paid by the Bank, the Taxpayer became the Bank's debtor, not vendor, and both treated it as the lending of money, not the sale and purchase of commercial paper. When that is the real situation, and the "debt" is evidenced, as it was here, by notes to which the Taxpayer was a party though not the maker,[7] the money advanced amounts to "indebtedness" under Section 439. Hunt Foods, Inc. v. Commissioner, 17 T.C. 365, affirmed 9 Cir., 204 F.2d 429; Brewster Shirt Corp. v. Commissioner, 2 Cir., 159 F.2d 227; Central Station Signals, Inc. v. Commissioner, 10 T.C. 1015, affirmed 2 Cir., 174 F.2d 479. If, on the other hand, in reality it was intended to be and was treated as a sale of the paper, the similarity to a debt that the transferor is obligated to make good the assignee's loss if the account debtor defaults, does not make it an indebtedness. East Coast Equipment Co. v. Commissioner, 3 Cir., 1955, 222 F.2d 676.

Without contradiction, Taxpayer in 1951 found itself with inadequate working capital to maintain its volume of sales. That its credit was unexceptional was demonstrated by the fact that an "open line" was extended for $150,000 which was the maximum permitted to this National Bank. This was on the Taxpayer's note bearing 4% interest. The Bank and Taxpayer agreed that as additional working capital was needed, the following procedure would be used for further advances that ran in the neighborhood of $200,000. As Taxpayer sold a machine on time, the conditional sales contract was assigned, and the accompanying promissory note of the customer was endorsed *with recourse.* The full face amount of the customer's note which bore 6% interest was immediately credited to Taxpayer's general checking account so that it had the full and immediate use of this money. On the books of the Bank, it was charged against Taxpayer on an indirect liability ledger sheet and was also entered on the bank records as loans and discounts.

Although most of the customer notes were for large sums of $10,000 or more, the Bank made no credit inquiry of the financial responsibility of any such customers. No record of the Bank reflected that the customer was indebted to the Bank. The Bank had nothing to do with either billing or collecting installments of interest or principal from a customer. On the contrary, by an automatic procedure, the Bank notified Taxpayer with respect to each note as each installment became due. Taxpayer remitted for the installment whether it had or had not been previously collected from the customer. If a customer defaulted, Taxpayer paid the note in full and took all steps to repossess the machinery or foreclose the installment sales contract. The Bank never returned the contract or the assigned customer note to the customer. In all cases these were returned to Taxpayer alone. Taxpayer kept those on which the customer had defaulted and returned the others to the customers on satisfaction of the contract.

Taxpayer likewise treated this as its liability. It was so much so that the Bank required a personal guaranty of

---

7. Under Section 719 of the earlier statute, the Tax Court held that the note, mortgage, etc., as evidence of the indebtedness need not be that of the taxpayer. Wm. A. Higgins & Co., 4 T.C. 1033, cited with approval, Hunt Foods, Inc. v. Commissioner, 17 T.C. 365, affirmed 9 Cir., 1953, 204 F.2d 429.

Taxpayer's president. On its annual financial statements its certified public accountant reflected this transaction with appropriate comments as a current liability.[8] Other action of Taxpayer was consistent. It recorded the 6% interest payments received from customers as interest income and it deducted as interest payable the 4% paid by it to the Bank on the outstanding balance of each assigned customer note.

We must take heed that "if anything is well settled it is that the term 'indebtedness', when used in a statute, lacks the fixed import of a word of art. Its meaning may be either broad or narrow," Commissioner of Internal Revenue v. Tennessee Co., 3 Cir., 1940, 111 F.2d 678, 679, and is " * * * one of broad content, so that its use legislatively will ordinarily involve possible irrelevancies of general connotation as to a particular statutory field," Mahoney Motor Co. v. Commissioner, 8 Cir., 1951, 192 F.2d 508, 511.

If viewed from the standpoint of this business, its method of regular operations and its needs, this arrangement with the Bank even satisfies most of the technical requirements of indebtedness, and those lacking on the surface are there in fact. There was a positive definite date fixed for the payment of the principal. This met the test " * * * that one of the fundamental characteristics of a debt is a definite determinable date on which the principal falls due," Brown-Rogers-Dixon Co. v. Commissioner, 4 Cir., 1941, 122 F.2d 347, 350. And there was, and was so recognized by both parties, " * * * the right to force payment of the sum as a debt in the event of default," United States v. South Georgia

Ry. Co., 5 Cir., 107 F.2d 3, 5. It is not controlling that the obligations, warranties and undertakings of Taxpayer as an unconditional indorser of negotiable paper, awesome as they are under the Uniform Negotiable Instruments Act, Section 66, 8 Am.Jur., Bills & Notes §§ 535, 537, 538 (1937), created a secondary, and hence contingent, liability dependent on the maker's default. For here the uncontradicted facts show that neither party considered or treated it as one of a simple negotiation by endorsement without more. The Bank looked to Taxpayer alone for prompt and timely payment. It was Taxpayer's obligation under the arrangement not merely to pay in the event of the maker's default as its engagement as an endorser implied. Its obligation was to pay when and as due and totally without regard to whether the maker was or was not in default, technical or substantial, or whether Taxpayer had yet received all or any part of the current payment from the maker.

Indeed, Taxpayer could not have been more positively bound had it executed its own note for the aggregate of the endorsed customer notes and then pledged them formally as security.

The fundamental error of the Government's approach is reflected by the closing refrain of its brief:

> "In the present case, its customers' notes were already a part of the taxpayer's assets. By indorsing them over to the bank the taxpayer was able to realize on them earlier than by collecting on them in ordinary course, but this was in practical result merely a change in the form of existing assets. There were no new

---

8. On Taxpayer's monthly statements, its annual income tax returns, and periodic reports to Caterpillar under its compulsory dealer accounting reports, Customer Notes Discounted were shown merely as a reduction of Notes Receivable, an asset. On cross examination Government counsel's questions indicated sharp skepticism that good accounting practices would permit this to be shown as a liability rather than a mere reduc-

tion in assets. But he could never shake taxpayer's accountant, an acknowledged expert whose treatment of it as a liability was on the basis of the actual handling of the arrangement. But questions, no matter how well founded, are not proof. And in any case, for regular income tax purposes, based upon income, not on a balance sheet, this was not decisive.

or additional investments in its business."

This ignores the realities of the business life of this Taxpayer. For on the uncontradicted record showing a need for additional working capital it was the advance arrangement for this credit which enabled Taxpayer to sell machines on time to its customers. Without the immediate and automatic credit the sale presumably would not be made. Without the sale there would have been no notes receivable. Without the notes receivable, there would have been no asset to exchange for the Bank's cash. The transaction could have, of course, taken the pattern of a sale of the installment contracts, East Coast Equipment Co. v. Commissioner, 3 Cir., 222 F.2d 676, supra. But it did not, and the result is not to be determined as though it had.

The cause must therefore be reversed for further and consistent proceedings.

Reversed and remanded.

WISDOM, Circuit Judge (dissenting).

With due deference to my learned brothers, I dissent from the holding that notes receivable discounted at a bank are "borrowed capital" for purposes of the Korean War excess profits tax.

The persuasive force of the majority opinion, if I may say so, comes from a proper distrust of broad, handed-down rules.[1] Courts should reach for realities instead of a rubric. But in this case, as in all cases where the decision turns on "the realities", the question is—what realities? To my mind, there is nothing realistic about treating a sale as a loan, an asset as a liability, and a contingent liability as an "outstanding indebtedness" within the meaning of the tax term "borrowed capital".

The hard cold truth is that the taxpayer sold (discounted) customers' notes receivable on the taxpayer's unrestrictive endorsement with recourse. There is nothing in the record to show that the taxpayer retained any title or attached any strings to the notes. Such a sale has certain legal consequences, whatever the parties may have thought or whatever thoughts may be read into their minds ex post facto, for the taxpayer and the bank were careless—or careful—enough not to state their intentions in a written agreement. The consequence of selling commercial paper is that the makers continue to owe the debt on the notes and the indorser (taxpayer) is not liable except secondarily, if and when a maker defaults. As a practical matter, Burford-Toothaker was not and never would be liable for more than a small fraction of the indebtedness due on the notes. To say, therefore, that the taxpayer "borrowed" the full amount of the indebtedness due on the notes is simply not descriptive of what happened.

The majority of the Court and the taxpayer do not deny that "on the surface of things" the taxpayer's liability "was secondary and hence contingent". It is urged, however, that the bank and the taxpayer both treated the transaction as "the lending of money". It seems to me that, in the absence of a written agreement, the evidence needed to contradict the usual effects of discounting commercial paper should be clear and overwhelming. The trial judge found that the taxpayer had failed to support its contention by its evidence. I read the record as showing more evidence of a sale than of a loan.

The taxpayer had reached the limit of its credit at the bank, under Alabama banking regulations.[2] The bank could handle the transaction only if it were not treated as a loan or as an extension to credit to the taxpayer. The bank there-

1. The majority opinion contends that the government has "an unrealistic disregard of the practical nature of the transaction" and "a dogged insistence on the rubric often announced that 'a contingent obligation may be a liability, but it is not a debt,' Guardian Investment Corp. v. Phinney, 5 Cir., 1958, 253 F.2d 326, 329, as well as the notion that the obligation, if contingent, becomes a debt only when the duty to pay becomes absolute".

2. Banking laws of the State of Alabama restrict outright loans on the Borrower's note to 10% of the capital and surplus of the bank.

fore credited to the taxpayer the full amount of the indebtedness on the notes, indicative of a purchase rather than a loan. The taxpayer's actions were ambiguous and inconsistent. The trial judge found that the taxpayer's books "did not show any liability to the bank". The taxpayer's accountant testified that the discounted notes were current liabilities because, though the customers were primarily liable to the bank, legally they were not actually liable; the taxpayer was actually liable, though only secondarily liable legally. Overlooking the double-talk, the fact is that on monthly statements to Caterpillar Company and on federal income tax returns the accountant showed the discounted notes as an offset or as a reduction of notes receivable—an asset. In the text of the report attached to the annual statements the discounted notes were treated as an asset. Caterpillar required its dealers to show discounted notes as an asset, an offset to notes receivable.

The fact that the bank required Burford-Toothaker regularly to remit the amounts paid or due by the makers, and in some other respects looked to Burford to service the notes, should come as no surprise. The bank was in a position to require Burford to meet any conditions it imposed. The taxpayer has no complaint. The taxpayer converted its customers' notes receivable into cash and received 2% for its services as a collector for the bank. There is nothing unusual about this sort of arrangement. And it proves only that Burford-Toothaker collected for the bank (to the advantage of both) and was a conduit between the makers and the bank.

In final analysis, the case turns on the intention of Congress. No doubt Congress might have concocted an excess profits tax law in which "borrowed capital" would have been defined as "the amount of the taxpayer's outstanding liability". Instead, Congress chose a narrow definition of *obligation*. Congress defined "borrowed capital", in pertinent part as "the amount of the outstanding indebtedness * * * of the taxpayer". Section 439(b) (1), Code of 1939. At the time Congress adopted the Korean excess profits tax a large number of cases had held, with respect to the excess profits tax of World War II, that: "The term indebtedness, as used in the Revenue Act, implies an unconditional obligation to pay * * * While the sum of money may be payable upon a contingency, yet in such case it becomes a debt only when the contingency has happened, the term 'debt' being opposed to 'liability' when used in a sense of an inchoate or contingent debt".[3] Congress liberalized the Korean War excess profits tax in several respects, but not to the point of permitting as a credit for "borrowed capital" contingent liabilities or other uncertain and loose obligations that would throw the door wide open to subterfuge.

The evidence is clear that by oral agreement Burford-Toothaker was obligated to perform certain services for the bank. But the taxpayer's only legal liability on the notes discounted was contingent. I submit that it is a figure of speech, but only a figure of speech, unrelated to the realities in this case, to call these obligations "borrowed capital".

3. Gilman v. Commissioner, 8 Cir., 1931, 53 F.2d 47, 50, 80 A.L.R. 209. See also Canister Co. v. Commissioner, 3 Cir., 164 F.2d 579, certiorari denied 333 U.S. 874, 68 S.Ct. 904, 92 L.Ed. 1150; O. L. Downey Co. v. Commissioner, 8 Cir., 172 F.2d 810; Pacific Affiliates, Inc. v. Commissioner, 18 T.C. 1175, 1204–1205, affirmed per curiam, 9 Cir., 224 F.2d 578, certiorari denied 350 U.S. 967, 76 S.Ct. 437, 100 L.Ed. 840.