HART–BARTLETT–STURTEVANT GRAIN
CO. v. COMMISSIONER OF IN-
TERNAL REVENUE.

No. 14059.

United States Court of Appeals
Eighth Circuit.

May 5, 1950.

154

John H. McEvers, Kansas City, Mo. (Reece A. Gardner, G. Lee Burns, and Stinson, Mag, Thompson, McEvers & Fizzell, Kansas City, Mo. were with him on the brief), for petitioner.

Sumner M. Redstone, Special Assistant to the Attorney General (Theron Lamar Caudle, Assistant Attorney General, Ellis N. Slack and Lee A. Jackson, Special Assistants to the Attorney General, were with him on the brief), for respondent.

Before SANBORN, WOODROUGH, and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

Petitioner seeks review of a decision of the Tax Court sustaining the Commissioner in his determination of deficiencies in petitioner's declared value excess profits tax liability in the amount of $1,890.64 and in its excess profits tax in the amount of $77,766.00, both for the taxable year 1946. Petitioner sought redetermination by the Tax Court of the asserted deficiencies for the year in question on the ground that the Commissioner had erred (1) in holding that petitioner was not entitled to deduct as a business expense the sum of $7,942.04 expended during the taxable year by the Midwest Research Institute out of a total sum of $20,000 paid by petitioner to the Institute to carry on certain research and development work pursuant to contract; and (2) in holding that money borrowed by petitioner, evidenced by notes, to purchase United States war bonds did not constitute borrowed invested capital and could not be added to petitioner's credit for excess profits tax determination. The Tax Court decided that the Commissioner did not err in determining the deficiencies, its opinion together with its findings of fact being reported at 12 T.C. 760.

(1) As is shown in the tax court's findings and opinion, which are referred to here to avoid repetition, petitioner is a Missouri corporation engaged in the business of buying, selling and storing grain and selling feed throughout seven midwestern states with its principal place of business in Kansas City, Missouri. In connection with its business it owns and operates grain elevators in 54 towns and cities throughout these seven states. Its president, Paul D. Bartlett, and eight others, were the incorporators under the statutes of Missouri of the Midwest Research Institute, a nonprofit corporation. During all of the time material herein the Institute was engaged in carrying on and conducting scientific research in latent industrial and agricultural potentialities of the Middlewest area with the object of improving agricultural economy. The initial capital of the Institute consisted of contributions made by corporations and persons interested in the objectives to be sought by its work. On October 31, 1945, petitioner, as "Sponsor", and the Institute entered into a written contract whereby petitioner engaged the Institute to carry on research and development work for petitioner relating to chemicals (excepting certain ones) derivable from grain by fermentation processes. The contract contained the following pertinent provisions:

"2. The Sponsor hereby engages the Institute to carry on research and development work for the Sponsor relating to CHEMICALS, EXCEPTING ENZYMES AND ANTIBIOTICS, DERIVABLE FROM GRAIN BY FER-

MENTATION PROCESSES * * * for a period of TWO YEARS, BEGINNING OCTOBER 23, 1945.

* * * * * *

"3. The Sponsor agrees to appropriate a total sum not to exceed TWENTY THOUSAND Dollars on this project, and the Institute shall not expend more than said sum without first securing the specific written approval of the Sponsor to do so.

* * * * * *

"6. Invoices shall be rendered by the Institute on or about the first of each month for the charges and expenses [specified in the contract] incurred on behalf of Sponsor prior to the date of the invoice. The Sponsor agrees to pay the invoices of the Institute so rendered within 15 days after receipt thereof. * * *

* * * * * *

"9. Any and all patentable inventions, applications for patent and patents thereon, relating to the subject matter of the project as herein defined which may be hereafter made by staff members employed by the Institute on this project, during the term of this project and as a result thereof, shall become the property of the Sponsor, subject to the terms and conditions of this agreement. * * *

"10. The Institute shall cause to be kept complete and systematic memoranda in writing, including notes on all experimental and research work, descriptions, diagrams, and other data pertaining to the work done on said project, which memoranda shall be available at all times to the Sponsor. The Institute agrees to preserve and retain all such memoranda for at least five years from date hereof, it being understood that the Institute, at its option, may deliver such memoranda to the Sponsor and thereby be relieved of its obligation to preserve and retain the same. In the event the Sponsor desires to keep secret any new process, device, machine, or composition of matter, relating to the project and resulting from the research investigations and activities under this agreement, the Institute shall use its best efforts to maintain the same secret and not to 'disclose the same to any third party without the consent of the Sponsor.

* * * * * *

"14. The Institute agrees that it will not conduct investigations relating to this project for any other party during the period it is performing work on this project.

"15. In the event the project sum is expended prior to the expiration of this agreement, then this project shall terminate unless the Sponsor in writing authorizes the institute to continue this project. Should the solution of the problem covered by this agreement be obtained to the satisfaction of the Sponsor or the steering committee before the project sum is expended, the Sponsor reserves the right to terminate this agreement but agrees to give thirty (30) days' written notice of its election to do so to the Institute."

The Institute commenced work on the project and attempted to develop a new product from agricultural material using biological processes. Research was done on acotic, muriatic and humuric acids. Nothing of a commercial value or of patentable nature was developed by the end of the taxable year of 1946, however, and the biological research was dropped on November 1, 1946, and the scientists working on the project shifted into another field of research. Of the $20,000 appropriated by petitioner for the Institute, $7,942.04 was expended by the Institute during the taxable year in question, and that sum petitioner sought to deduct from its income for that year. The deduction was disallowed by the Tax Court which held that that amount was a capital expenditure.

We find no error in the determination by the Tax Court on this question. The Internal Revenue Code, 26 U.S.C.A. § 23 (a) (1) (A), provides:

"In computing net income there shall be allowed as deductions:

"All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * *."

Treasury Regulations 111, 26 Code of Federal Regulations 29.23 (1)-8, promul-

gated under the Internal Revenue Code, provides: "Depreciation of Drawings and Models.—If a taxpayer has incurred expenditures in his business for designs, drawings, patterns, models, or work of an experimental nature calculated to result in improvement of his facilities or his product, and if the period of usefulness of any such asset may be estimated from experience with reasonable accuracy, it may be the subject of depreciation allowances spread over such estimated period of usefulness. The facts must be fully shown in the return or prior thereto to the satisfaction of the Commissioner. Except for such depreciation allowances no deduction shall be made by the taxpayer against any sum so set up as an asset except on the sale or other disposition of such asset at a loss or on proof of a total loss thereof."

Clearly the petitioner here has incurred expenditures in its business for work of an experimental nature calculated to result in improvement of its facilities or its products and is not entitled to deduct those expenditures from its net income. Petitioner insists that the expenditures in question were incurred for general scientific research as opposed to research to develop, perfect or obtain patents on a particular process or formula. That the term "calculated to result in improvement of" the taxpayer's "facilities or his product" means that only where there is a planned, specified facility or improvement in question must expenditures thereon be capitalized. That its research here was merely a long range "shot in the dark" and it was neither contemplated that it would produce a valuable asset nor was there ever any particular hope that it would. That the scientists working on the project had no commercial objective in mind but were only trying to improve agricultural economy for the farmer by chemical methods, thereby improving the general economy and consequentially the petitioner's business.

Petitioner's argument is appealing but it is confuted by the facts evidenced by its contract with the Institute, and that contract "must be accepted as reflecting the actual nature of the transaction." Coleman v. Commissioner, 8 Cir., 180 F.2d 758, 760. As set out above, that contract provided not merely for general research in the field of farm products, as petitioner contends, but for. "* * * research and development work for the Sponsor relating to CHEMICALS, EXCEPTING ENZYMES AND ANTIBIOTICS, DERIVABLE FROM GRAIN BY FERMENTATION PROCESSES * * * for a period of Two YEARS, BEGINNING OCTOBER 23, 1945." Provisions were carefully made to preserve for the taxpayer patentable inventions, applications for patents and patents thereon which might be made by staff members in the research for petitioner. Complete and systematic memoranda were. to be kept by the Institute during all the work and be at all times available to petitioner. Provision was made to keep secret any processes, devices or machines resulting from the research which petitioner wanted kept secret. The Institute agreed not to conduct investigations relating to "this project" for any other party during the contract period. Petitioner reserved the right to terminate the contract should the solution of "the problem" covered by the agreement be obtained before the sum it had appropriated for the research was expended. Had petitioner not seriously calculated or contrived to improve its facilities or its product by the expenditures made for the research in question, it is difficult to imagine why it set out the detailed provisions in the contract for the disposition of results accomplished by the project. From a reading of the provisions in the contract, we cannot conclude that it was not within the contemplation of both parties to the contract that research in respect to chemicals derivable from grain might develop something of a commercial and permanent value to petitioner. And it has been consistently held that experimental and research expenditures incurred in the development of new processes or formulae or patents are capital expenditures. Claude Neon Lights, Inc., v. Commissioner, 35 B.T.A. 424, 442; Hazelton Corp. v. Commissioner, 32 B.T.A. 110, 112; Canning v. Commissioner, 29 B.T.A. 99, 107; Forest Products Chemical Co. v. Commissioner, 27 B.T.A. 638; Acme Products Co., Inc. v. Commissioner, 24

B.T.A. 194; Goodell-Pratt Co. v. Commissioner, 3 B.T.A. 30; Gilliam Mfg. Co. v. Commissioner, 1 B.T.A. 967; Dempster Mill Mfg. Co. v. Commissioner, D.C., 46 F.2d 604. Where there has been a complete abandonment of experiments and failure becomes an actual fact, a loss may be taken by way of deduction from net income. Perine v. Commissioner, 22 B.T.A. 201; Dresser Mfg. Co. v. Commissioner, 40 B.T.A. 341; Acme Products Co. v. Commissioner, supra. At the end of the taxable year in question, April 30, 1946, petitioner had not abandoned its project and was still promoting its research. The fact that it continued its expenditures on the project until the following November indicates that as of April 30 it still must have had reasonable hopes of success. Petitioner's research expenditures incurred by April 30, 1946, must be taken as capital expenditures. How the expenditures should be treated for tax purposes during the year in which the experiments were finally abandoned was not before the Tax Court and is not before us.

(2) The second question is whether sums borrowed by petitioner used to purchase United States bonds during war loan drives constitute borrowed invested capital under the Internal Revenue Code. As set out by the Tax Court, petitioner owns and operates grain elevators in 54 towns and cities throughout the area in which it does business. It buys grain from the farmer and sells it to merchants, millers and speculators. The buying end of petitioner's business is highly competitive and petitioner's policy was to obtain local good will by causing its employees in these many communities to participate in local affairs and become a part of the community and thereby create a feeling of friendship toward the petitioner among the local farmers so that they would come to petitioner to sell their grain. During the war years petitioner's elevator managers were requested by local committees to purchase their respective quotas of war bonds or other United States obligations and the managers passed these requests on to the home office. Similar requests were made of petitioner itself. Accordingly, after informal discussion among its officers, but without formal action by its board of directors, petitioner participated in the fourth, fifth, sixth, seventh and eighth war loan drives and allocated its purchases of United States obligations for quota purposes to the various communities where its elevators were located. To acquire the bonds in question petitioner borrowed $4,953,000, evidenced by its notes, and secured the notes by the bonds purchased. When the bonds were sold, and they were all sold by petitioner after the close of the fiscal year April 30, 1946,[1] the notes which they secured were retired with the proceeds from the sales of the bonds. And in most instances the interest rate of the bonds and of the notes given by petitioner was the same. The daily average of these borrowings amounted to $3,198,032.58, which sum petitioner included as borrowed invested capital in its excess profits tax return for the period in question, computing its liability by using an excess profits credit based on the invested capital method.

Section 719, 26 U.S.C.A., provides:

"(a) Borrowed capital. The borrowed capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following:

"(1) The amount of the outstanding indebtedness (not including interest) of the taxpayer which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust, * * *."

Treasury Regulation 112, 26 Code of Federal Regulations, 35.719-1, provides: "Borrowed Invested Capital.—* * * In order for any indebtedness to be included in borrowed capital it must be bona fide. It must be one incurred for business reasons and not merely to increase the excess profits credit. * * *."

1. At this time the Excess Profits Tax was no longer in effect, having been terminated by the Revenue Act of 1945, effective as to taxable years beginning after December 31, 1945.

Petitioner insists that its officers determined that to further the good will in the 54 communities and to enhance its chances of business success, it would borrow money to purchase and allocate the bonds in question throughout the communities. That it was primarily motivated by business purposes alone. That it does not contend "that its action in buying the bonds was altruistic or done for patriotic purposes." That its business purpose was accomplished when it received the credit for the bonds purchased and the advertising attendant thereon. That the indebtedness was "incurred for business reasons and not merely to increase the excess profits credit."

Petitioner's argument fails to convince that its actions have brought it under the wording of Section 719 or Regulation 112, supra. We note that the statute does not provide for a credit based on a taxpayer's total asset value, but only upon invested capital. And while the sums borrowed by petitioner do constitute borrowed capital they do not constitute borrowed invested capital. The sums borrowed were never actually invested as a part of petitioner's working capital, they were never utilized for the earnings of profits and they were never subject to the risk of petitioner's business. Cf. La Belle Iron Works v. United States, 256 U.S. 377, 388, 389, 41 S.Ct. 528, 65 L.Ed. 998; Commissioner v. South Texas Co., 333 U.S. 496, 497-498, 68 S.Ct. 695, 92 L.Ed. 831; West Construction Co. v. Commissioner, 7 T.C. 974, 978; Player Realty Co. v. Commissioner, 9 T.C. 215, 218. The finding of the Tax Court that "the sums here in question were not borrowed for business reasons" is supported by substantial evidence and is not clearly erroneous.

Petitioner argues, however, that Regulation 112 is in direct conflict with Section 719 of the statute in that the statute itself is clear and unambiguous and the term therein, "indebtedness", cannot be delimited by the regulation to mean "indebtedness incurred for business reasons and not merely to increase the excess profits credit." We find that the regulation is in clear harmony with the statute, is neither unreasonable nor inconsistent with the

provisions thereof, and fairly carries out the intendment of the statute. It is, therefore, not subject to attack. In Commissioner v. South Texas Co., supra, 333 U.S. at page 501, 68 S.Ct. at page 698, 92 L.Ed. 831, the court stated: "This Court has many times declared that Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes and that they constitute contemporaneous constructions by those charged with administration of these statutes which should not be overruled except for weighty reasons." See also Bingham's Trust v. Commissioner, 325 U.S. 365, 377, 65 S.Ct. 1232, 89 L.Ed. 1670, 163 A.L.R. 1175; Fawcus Machine Co. v. United States, 282 U.S. 375, 378, 51 S.Ct. 144, 75 L.Ed. 397.

We conclude that petitioner's participation in the war loan drives does not evidence such an investment as would justify the inclusion of the amounts borrowed in order to participate to be included in borrowed invested capital under the statute and regulation, supra.

The determinations of the Tax Court were not erroneous and its decision is affirmed.

Affirmed.