PACIFIC AFFILIATE, INC., A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 12836.   Promulgated September 30, 1952.

*George H. Koster, Esq.*, for the petitioner.
*T. M. Mather, Esq.*, for the respondent.

1176

1178

1180

1186

1192

1194

1196

1198

1200

1202

OPINION.

VAN FOSSAN, *Judge:* The parties have, by stipulation, made certain concessions and have eliminated various items from controversy. These concessions and stipulations will be reflected in a recomputation under Rule 50. The ten questions remaining will be considered in the sequence set out in the preface to the Findings of Fact.

We first consider whether the petitioner's margin account liability to Bear, Stearns is allowable as borrowed invested capital within the meaning the section 719, Internal Revenue Code.[2]

During the years under review, petitioner maintained a margin account through which it purchased a large quantity of securities. These securities were held in this account to secure the payment of the balance due therein. Petitioner claimed its indebtedness on this margin account as "borrowed capital." Respondent disallowed the inclusion of such amount within petitioner's "borrowed capital" and here argues that such indebtedness was not evidenced by one of the seven types of instruments specifically called for in the statute. Petitioner, on the other hand, contends that in margin account transactions the relationship between customer (here petitioner) and broker (here Bear, Stearns) is that of pledgor-pledgee; that a margin account arrangement is a pledge of securities with the broker to secure loans made by the broker to the customer; and that such an arrangement as is here in question, as evidenced by the documents executed incident thereto, in law, constitutes a mortgage for borrowed capital purposes.

Petitioner cites, and relies upon, *Brewster Shirt Corporation* v. *Commissioner*, 159 F. 2d 227, reversing our Memorandum Opinion. In that proceeding Brewster, in order to acquire necessary operating capital, entered into a written agreement in which it agreed to assign, as collateral security, its accounts receivable to a factor. The factor agreed to advance 90 per cent of the face value of the accounts and to pay the balance, less a stipulated charge of three-fourths of 1 per cent per month upon payment of the accounts assigned. Brewster agreed to repurchase at face value those accounts not paid at maturity, and otherwise assumed all credit risks incident to the accounts. The Court of Appeals held that the instrument, pursuant to which amounts were advanced to Brewster, constituted in law a mortgage and that the amounts so advanced were allowable as borrowed invested capital.

---

[2] SEC. 719. BORROWED INVESTED CAPITAL.

(a) BORROWED CAPITAL.—The borrowed capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following:

(1) The amount of the outstanding indebtedness (not including interest) of the taxpayer which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust, plus,

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(b) BORROWED INVESTED CAPITAL.—The borrowed invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be an amount equal to 50 per centum of the borrowed capital for such day.

The *Brewster* case is, we believe, distinguishable from the one before us and is inapplicable here. In the instant proceeding the basic agreement, as witnessed by the documents in evidence, pursuant to which the petitioner's margin account was established and maintained, was of the sort commonly found in the investment brokerage business. As we read it, it did nothing more than establish a certain line of credit to petitioner for the purchase in the financial market of securities which were to be held as collateral against default in payment of the full purchase price. There was no actual assignment of specific securities to secure the repayment of any fixed sum to be advanced. In fact, the record discloses no advance of moneys actually received by petitioner. We cannot say that the instruments involved legally constituted a mortgage within the meaning of section 719, *supra.* Cf. *Consolidated Goldacres Co.* v. *Commissioner*, 165 F. 2d 542, affirming 8 T. C. 87, certiorari denied 334 U. S. 820; *Bernard Realty Co.* v. *United States*, 188 F. 2d 861; *Pendleton & Arto, Inc.*, 8 T. C. 1302. If our judgment, that the situation here involved is distinguishable from that present in *Brewster*, be ill founded, then with all respect for the distinguished court that reversed our holding in the *Brewster* case, we adhere to the rationale of our opinion therein.

We hold, therefore, that respondent did not err in his determination that petitioner's margin account liability did not represent "borrowed capital" within the intendment of section 719, *supra.*

The next issue involves the question of whether certain Federal Land Bank bonds, purchased and sold by petitioner in 1943, were capital assets or were held primarily for sale to customers in the ordinary course of petitioner's business.

Petitioner's president, during the period here involved, testified that these Federal Land Bank 4 per cent bonds were purchased purely for petitioner's house investment account. Having considered his testimony in the light of the other evidence of record, we have come to the conclusion, and found as a fact, that the bonds were not acquired for resale to petitioner's customers in the ordinary course of its trade or business. Consequently, we hold that the bonds represented capital assets to petitioner from the sale of which it sustained a capital loss in the amount of $89,440.45.

Having determined that the bonds represented capital assets to petitioner, two additional questions arise, first, whether the money borrowed to carry them represented borrowed capital, and, second, the method to be employed in computing the amortization of the bond premium paid by petitioner. As to the first, whether the amount borrowed to carry these bonds is includible in petitioner's borrowed capital within the purview of section 719, it is to be noted that the

purchase price of the bonds in question was based upon a .65 per cent interest basis yield. When petitioner effected their purchase, it borrowed substantially all of the purchase price at an interest rate of .75 per cent. Respondent has declined to include the amount so borrowed within petitioner's "borrowed capital." He argues in support that since the interest yield of the bonds was less than the amount actually paid to carry them, they were not acquired with any prospect of profit; that clearly no business purpose could have been served thereby; and that the transaction comes within the regulations disallowing the inclusion of an indebtedness incurred merely to increase excess profits credit.

*Hart-Bartlett-Sturtevant Grain Co.* v. *Commissioner*, 182 F. 2d 153, affirming 12 T. C. 760, cited by respondent, is inapposite here. In that case, the taxpayer purchased bonds merely to create good will in the communities in which it did business. It had no intent to profit otherwise.

Here, at the time the bonds were acquired, petitioner's management entertained the mistaken belief that the interest received from the bonds would be tax exempt and the interest paid to carry them would be deductible, and that, accordingly, a profit would ensue. There is substantial evidence to the effect that this hope of profit was the only motivating factor in petitioner's action in entering into the transaction. As soon as petitioner learned of its mistake, it forthwith took steps culminating in the sale of the bonds. There is no evidence of record which tends to show that the purchase of these bonds was motivated by petitioner's desire to increase its excess profits credit. We are of the opinion that there was a business purpose served by petitioner's acquisition of these bonds and in the indebtedness incurred to carry them. See *Mahoney Motor Co.* v. *Commissioner*, 192 F. 2d 508, reversing 15 T. C. 118.

Respondent suggests, on brief, that it is extremely doubtful whether the form of petitioner's obligation to carry the bonds meets the requirements of a note, mortgage, or other form of indebtedness specified in section 719.

On April 5, 1943, petitioner executed a continuing loan agreement pursuant to which on the same date it executed a printed form requesting a loan of "* * * $5,014,000, payable on demand with interest at the rate of ¾ per cent per annum, payable monthly * * *." When this latter instrument is considered, together with the continuing loan agreement, we think that it legally constitutes a fixed obligation to pay a sum certain on demand at a fixed rate of interest, and hence, was a *de facto* note. We, therefore, hold that the amount so borrowed represents "borrowed capital" within the meaning of section 719, and respondent erred in not so including it.

We turn to a consideration of the proper period over which the bond premium should be amortized.

In determining the deficiency here involved, the respondent reduced the cost of the bonds by amortization computed and applied pursuant to section 125, Internal Revenue Code, the pertinent portions of which appear in the margin.[3] The amortization so computed and applied, was spread over the period from the date the bonds were purchased by petitioner to the earliest call date thereof. Petitioner argues that it has the right to select the period over which the amortization is spread by electing to use either any call date or the maturity date; that as soon as it was called upon to do so it expressed its election to have the bond premium amortized over a period extending from the purchase date to the maturity date thereof; that the respondent is without authority under the law to substitute his selection therefor; and that, therefore, respondent erred in so computing and applying the amortization to the earliest call date. We disagree.

Section 125, *supra*, provides for the amortization of bond premiums by the obligee. It is mandatory with respect to purely tax exempt

---

[3] SEC. 125. AMORTIZABLE BOND PREMIUM.

(a) GENERAL RULE.—In the case of any bond, as defined in subsection (d), the following rules shall apply to the amortizable bond premium (determined under subsection (b)) on the bond for any taxable year beginning after December 31, 1941:

\*      \*      \*      \*      \*      \*      \*

(2) INTEREST WHOLLY TAX-EXEMPT.—In the case of any bond the interest on which is excludible from gross income, no deduction shall be allowed for the amortizable bond premium for the taxable year.

\*      \*      \*      \*      \*      \*      \*

(b) AMORTIZABLE BOND PREMIUM.—

(1) AMOUNT OF BOND PREMIUM.—For the purposes of paragraph (2), the amount of bond premium, in the case of the holder of any bond, shall be determined with reference to the amount of the basis (for determining loss on sale or exchange) of such bond, and with reference to the amount payable on maturity or on earlier call date, with adjustments proper to reflect unamortized bond premium with respect to the bond, for the period prior to the date as of which subsection (a) becomes applicable with respect to the taxpayer with respect to such bond. In no case shall the amount of bond premium on a convertible bond include any amount attributable to the conversion features of the bond.

(2) AMOUNT AMORTIZABLE.—The amortizable bond premium of the taxable year shall . be the amount of the bond premium attributable to such year.

(3) METHOD OF DETERMINATION.—The determinations required under paragraphs (1) and (2) shall be made—

(A) in accordance with the method of amortizing bond premium regularly employed by the holder of the bond, if such method is reasonable.

(B) in all other cases, in accordance with regulations prescribing reasonable methods of amortizing bond premium, prescribed by the Commissioner with the approval of the Secretary.

\*      \*      \*      \*      \*      \*      \*

(d) DEFINITION OF BOND.—As used in this section, the term "bond" means any bond, debenture, note, or certificate or other evidence of indebtedness, issued by any corporation and bearing interest (including any like obligation issued by a government or political subdivision thereof), with interest coupons or in registered form, but does not include any such obligation which constitutes stock in trade of the taxpayer or any such obligation of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or any such obligation held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

\*      \*      \*      \*      \*      \*      \*

bonds. See Report No. 1631, Senate Finance Committee, 77th Cong., 2d Sess., p. 92. The amortizable bond premiums of the taxable year is the amount of the bond premium attributable to such year. Section 125 (b) (2). In the case of tax exempt bonds no deduction for the amortizable premium is allowable. Section 125 (a) (2).

The legislative history of section 125 clearly shows that the total premium is to be amortized over a period extending down to the earliest call date rather than down to the maturity date. In this connection, Report No. 1631, *supra*, at page 94, reads, in part, as follows:

> The fact that a bond is callable  *  *  *  does not of itself prevent the application of this section. In the case of a callable bond, the earliest call date will, for the purposes of this section, be considered as the maturity date. Hence, the total premium is required to be spread over the period from the date as of which the basis of the bond is established down to the earliest call date, rather than down to the maturity date.  *  *  *

See also Regs. 111, sec. 29.125–5. In view of the foregoing, we must sustain respondent in his determination of the bond premium amortization and the period over which such amortization should be spread.

The next issue involves the amounts borrowed by petitioner to finance its April 16, 1943, and September 15, 1943, subscriptions for certain United States Treasury bonds, and the amount which petitioner borrowed for its purchase in 1944 of A. T. & T. convertible debenture bonds. With respect to the indebtednesses incurred in connection with both purchases of United States Treasury bonds the specific question is whether the full amounts of such loans are includible in petitioner's borrowed capital rather than 50 per cent thereof as determined by respondent. As for the amount borrowed to purchase the A. T. & T. bonds, the issue is whether or not any of that indebtedness is so includible. In both instances the pertinent portion of the Code is section 719.

In or about April 1943, petitioner and its business associate, Blair, entered into an arrangement whereby petitioner would borrow funds to carry the purchase in its own name of $20,000,000 worth of United States Treasury bonds. On April 19, 1943, petitioner borrowed $19,800,000 of the necessary funds from Guaranty Trust Co. of New York at an interest rate of three-fourths per cent, and the bonds thus purchased were pledged as collateral therefor. On its books petitioner maintained a special account with Blair wherein it was charged 50 per cent of the interest paid to carry the bonds and credited the interest accruing on 50 per cent of the bonds. The net amount was subsequently paid to Blair.

In September 1943 petitioner again entered into a similar arrangement with Blair pursuant to which petitioner borrowed an additional $19,800,000 from the Bank of America to finance the purchase in its own name of more United States Treasury bonds in the net amount of

$20,000,000. This time the arrangement with Blair differed from the earlier one in that it contemplated a sharing of the profits on the bonds as well as a sharing of the interest accruing thereon. In all other respects the transaction was similar to the preceding one. A bond account was kept on petitioner's books and 50 per cent of the net amount derived therefrom paid to Blair.

Respondent has allowed 50 per cent of the indebtedness so incurred by petitioner as borrowed invested capital until November 16, 1943, and 100 per cent thereafter. He argues, on brief, that "* * * Where monies are borrowed in a joint venture or enterprise the borrower is not entitled to include in invested capital borrowing in excess of his interest in the venture." On the record, we believe respondent made a correct determination. Albeit petitioner made the purchase of bonds in its own name, the arrangement supporting the purchase and the manner in which petitioner handled the transaction on its books, convince us that Blair was more than a passive recipient of the benefits of the deal, and, had occasion arisen to present the question, Blair would have been held to account for a 50 per cent responsibility in the loans and purchases, not only in the profits. Since each case turns on the particular facts appearing, and since no two cases present identical facts, we get little help from the cited cases. We sustain respondent's action in respect to this item.

We turn now to the question involving petitioner's purchase in 1944 of certain A. T. & T. 3 per cent convertible debentures and the money borrowed to carry them.

These bonds were bought by petitioner in the face amount of $1,000,000. The purchase price paid therefor was $1,170,000. Petitioner borrowed $1,050,000 thereof at an interest rate of 1 per cent per annum.

Respondent determined that the indebtedness so incurred was not includible in petitioner's borrowed invested capital for the reason that the primary purpose thereof was one of tax avoidance. He advances no argument on brief to support such determination.

While the evidence tends to show that petitioner's management was aware of possible tax advantages flowing from the transaction in the form of the amortization of the bond premium out of earned income, it also shows that this consideration was secondary to petitioner's decision to enter into the transaction with the bona fide business purpose of realizing the profit which it subsequently derived. In our opinion, therefore, respondent erred in his disallowance of the amount in question as a part of petitioner's borrowed invested capital for 1944, and we so hold.

The next issue is whether respondent erred in disallowing as part of petitioner's equity invested capital for the years 1943 and 1944 the amount of $278,240.98.

Petitioner was organized in 1930 as the wholly owned subsidiary of Corporation of America, a wholly owned subsidiary of Transamerica Corporation. It was so organized to take over the assets and liabilities of two other corporations, the capital stock of which was also wholly owned by Transamerica. Upon its organization, petitioner's capital stock, consisting of 500 shares at a par value of $1,000 per share, was issued for cash at $2,500 per share, or a total of $1,250,000. Shortly thereafter, the Liquidating Committee of the Corporation of America caused petitioner to take over certain assets of the two Transferor Companies, namely, seats on the San Francisco and Los Angeles Stock Exchanges at an aggregate price of $335,000. The market value of these memberships at the time they were thus taken over totaled approximately $46,500. In a later *quasi* reorganization Transamerica revalued its assets. During this revaluation of assets, Transamerica set up a reserve of $278,240.98, representing the difference between the value ascribed to its investment in petitioner's capital stock and the appraised value of that investment. This reserve was subsequently credited to petitioner's account.

In computing its invested capital, petitioner has treated the $1,250,000 cash received upon issuance of its stock as equity invested capital and added thereto the $278,240.98 subsequently so credited to it by Transamerica. Respondent, on the other hand, has determined that the amount of $1,250,000 paid in by Transamerica for petitioner's stock at the time of its formation, in effect, included the stock exchange memberships taken in at the stated value of $335,000; that after various adjustments, this stated value was $278,240.98 in excess of the bases to the transferors; that this excess represents an abatement of the original sum paid in or a distribution to the parent corporation within the meaning of section 718 (b) and (c), Internal Revenue Code; [4] and that the later credit to petitioner's account of

---

[4] SEC. 718. EQUITY INVESTED CAPITAL.

\* \* \* \* \* \* \*

(b) REDUCTION IN EQUITY INVESTED CAPITAL.—The amount by which the equity invested capital for any day shall be reduced as provided in subsection (a) shall be the sum of the following amounts—

(1) DISTRIBUTIONS IN PREVIOUS YEARS.—Distributions made prior to such taxable year which were not out of accumulated earnings and profits;

(2) DISTRIBUTIONS DURING THE YEAR.—Distributions previously made during such taxable year which are not out of the earnings and profits of such taxable year;

\* \* \* \* \* \* \*

(c) RULES FOR APPLICATION OF SUBSECTIONS (a) AND (b).—For the purposes of subsections (a) and (b).—

(1) DISTRIBUTIONS TO SHAREHOLDERS.—The term "distribution" means a distribution by a corporation to its shareholders, and the term "distribution in stock" means a distribution by a corporation in its stock or rights to acquire its stock. To the extent that a distribution in stock is not considered a distribution of earnings and profits it shall not be considered a distribution. A distribution in stock shall not be regarded as money or property paid in for stock, or as paid-in surplus, or as a contribution to capital.

\* \* \* \* \* \* \*

$278,240.98 was, in effect, a capital contribution to petitioner to reimburse it for the excessive amount at which the stock exchange memberships were taken in. Accordingly, respondent has computed petitioner's paid-in capital to be $1,250,000. He now points out on brief that certain clerical errors were made in petitioner's favor with respect to the computation of the amount by which the stated value of the above stock exchange memberships exceeded their bases to the transferors. However, respondent makes no affirmative claim for the sum so erroneously omitted from his original notice of deficiency and we will proceed without further references to it.

At the time petitioner took over the seats in question, it gave credit to transferors in the sum of $46,250, which amount represented the market value of those assets. The balance of the price was left to the decision of a committee selected by the parties which shortly thereafter decided that petitioner should take in these memberships at a stated value aggregating $335,000. The committee rendering this decision was denominated the Liquidating Committee of the Corporation of America and was apparently formed incident to the plan whereby petitioner was organized to take over the assets and liabilities of the transferors. In any event, its activities in connection with petitioner's organization may be regarded as an integral part of the plan therefor inasmuch as they occurred approximately contemporaneously therewith. Moreover, since the parties to the transaction were all members of the affiliated group controlled by Transamerica, the committee which was selected by them was effectively under the domination of that parent corporation and reflected its decisions.

The additional charge to petitioner for these exchange memberships, pursuant to the committee's action, actually resulted in Transamerica's being credited back with a portion of the amount which it simultaneously therewith had paid in to petitioner's capital. It makes no difference whether we consider this transaction as an abatement of such an amount or as a distribution under section 718, *supra*. The fact is that petitioner's authorized capital was, from its beginning, diminished by the difference between the amount which was charged for the memberships and the market value thereof. This interpretation of the transactions surrounding petitioner's organization is lent credence by Transamerica's subsequent actions in first creating a reserve for revaluation of the seats and then later actually crediting petitioner with the amount thereof. Respondent is, therefore, affirmed as to this issue.

The next issue is whether certain securities sold by petitioner in each of the taxable years were capital assets. The securities thus sold had been held by petitioner for varying periods of time—some for more than six months, others for less than six months. Petitioner re-

ported the results of all such sales as capital gains or losses. It here argues that the securities involved were held by it in its capacity as trader for its own account and risk. Respondent has determined that the securities disposed of by petitioner were not capital assets within the definition of section 117 (a), I. R. C.,[5] and, therefore, the sales resulted in ordinary income or loss. In support of his determination, respondent argues that the sales in question were of securities held by petitioner, as a dealer therein, primarily for sale to customers in its ordinary course of business.

This Court has consistently recognized the fact that a taxpayer, such as petitioner herein, may trade in securities on its own account and risk at the same time it is a dealer with respect to similar securities held for sale to customers. *E. Everett Van Tuyl*, 12 T. C. 900; *Carl Marks & Co.*, 12 T. C. 1196; *Stern Bros. & Co.*, 16 T. C. 295; and *George R. Kemon*, 16 T. C. 1026. As to those held for investment or speculation on its own account, the taxpayer is not a dealer and is not entitled to compute income on the inventory method. Such securities properly constitute capital assets. *E. Everett Van Tuyl, supra; Stern Bros. & Co., supra; George R. Kemon, supra.* On the other hand, those acquired and held primarily for sale to customers in the ordinary course of business are specifically excluded from "capital assets" by the statutory definition thereof. However, securities originally acquired and held for either purpose may be freely appropriated to the other purpose at the discretion of the taxpayer exercised in good faith. *Carl Marks & Co., supra.* Therefore, the ultimate question to be resolved is the purpose for which a particular security is held at the time of its sale. Such question is essentially one of fact. *Stern Bros. & Co., supra.*

In determining whether a particular security was or was not thus held for sale to customers in the ordinary course of business, the most crucial factor to consider is the phrase "to customers." *George R. Kemon, supra.* Securities sold on an exchange are not considered as having been sold to "customers." *Thomas E. Wood*, 16 T. C. 213. For that reason, a stock speculator trading on his own account is not considered to have customers. *George R. Kemon, supra.* In this connection, we said in the *Kemon* case:

\* \* \* Those who sell "to customers" are comparable to a merchant in that they purchase their stock in trade, in this case securities, with the expectation

---

[5] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

    (1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

        (A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

    \*      \*      \*      \*      \*      \*      \*

of reselling at a profit, not because of a rise in value during the interval of time between purchase and resale but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost. This excess or mark-up represents remuneration for their labors as a middle man bringing together buyer and seller, and performing the usual services of retailer or wholesaler of goods. Cf. *Schafer* v. *Helvering, supra; Securities-Allied Corp.* v. *Commissioner*, 95 F. 2d 384, certiorari denied, 305 U. S. 617, affirming 36 B. T. A. 168; *Commissioner* v. *Charavay*, 79 F. 2d 406, affirming 29 B. T. A. 1255. Such sellers are known as "dealers."

Contrasted to "dealers" are those sellers of securities who perform no such merchandising functions and whose status as to the source of supply is not significantly different from that of those to whom they sell. That is, the securities are as easily accessible to one as the other and the seller performs no services that need be compensated for by a mark-up of the price of the securities he sells. The sellers depend upon such circumstances as a rise in value or an advantageous purchase to enable them to sell at a price in excess of cost. Such sellers are known as "traders."

The record in the instant proceeding discloses that during the taxable years petitioner engaged in extensive trading on its own account and risk aside from its regular "dealer" business. Often such trading was in securities similar to those which petitioner was at the same time, as a dealer, selling to its customers; and during the greater part of 1943 petitioner made no segregation or identification on its general ledger accounts as to the purpose for which a particular security was held. No such identification or segregation was begun and effected until October or November, 1943. While such lack of identification and segregation is of some significance and may not be totally disregarded, we by no means feel that it decisively indicates that petitioner engaged in no trading activities on its own account or that all of the securities acquired by it, and here in dispute, were devoted to petitioner's retail or wholesale "dealer" business. Most of the securities here in question and which petitioner claims were held for trading and speculation on its own account, were acquired through the margin account which petitioner established with Bear, Stearns. Such securities were generally held in that account until later sold through it. Prior to the establishment of the account, in January 1943, the securities involved in petitioner's trading activities were, for the most part, purchased from or through Bear, Stearns, held in a New York depository, and then sold to or through Bear, Stearns. On a number of occasions during 1943 and 1944, various securities held in petitioner's margin account were transferred and withdrawn to be used for retail distribution. There were a few instances when securities acquired through other means were deposited in the account. There were even times when a particular block of securities would be withdrawn, presumably to be used for retail distribution, only to be redeposited in the margin account. We do not agree with respondent's contention that such withdrawals and deposits conclusively show that

all of the securities in question were held by petitioner, as a dealer, for sale to customers in the ordinary course of its business and, therefore, includible in petitioner's inventory. To the contrary, the evidence, as a whole, is quite convincing that the primary purpose for the establishment and maintenance of the margin account was its use in conjunction with petitioner's trading activities aside from its dealer business. Further, we are satisfied that such securities as were purchased through the account, held or deposited therein, were held in petitioner's capacity as a trader on its own account until they were later either sold in that capacity or appropriated to retail distribution and sale.

In its income tax return for 1943, petitioner reported long term capital gains derived from the sales of certain blocks of bonds of Kansas City, Fort Scott & Memphis Railway, Milwaukee, Sparta & Northwestern Railway, and Chicago, Milwaukee & St. Paul Railway Co. We have found that the $500,000 Kansas City, Fort Scott & Memphis bonds here in dispute were acquired through the margin account on May 3, 1943; that this block was held intact in the margin account until September 17, 1943, when $12,000 thereof was withdrawn to cover an earlier sale to retail of such bonds in that amount; and that bonds in the face amount of those so withdrawn were delivered into the margin account on September 27, 1943, where they were held together with the remaining $488,000 thereof until sold during November and December, 1943. We hold that $488,000 face amount of the bonds in dispute was held for investment and speculation on petitioner's own account and, therefore, constituted capital assets from the date of purchase, May 3, 1943, until the respective dates of sale in November and December, 1943. As for the $12,000 block deposited in the margin account to replace the bonds in that amount earlier withdrawn and appropriated to retail distribution, we hold that the bonds included in such block represented capital assets from and after September 27, 1943.

The $271,000 block of Milwaukee, Sparta & Northwestern bonds in dispute was originally acquired as a part of a $300,000 block of such bonds purchased in March 1942. An aggregate of $29,000 of the block originally acquired was sold to the public. No segregation or identification was made on petitioner's books as to the purpose for which such bonds were bought and held. We note, also, that the bonds in question were sold to Bear, Stearns prior to the time the margin account was opened, and there is no evidence of their having been otherwise physically segregated. While the record made might possibly warrant the assumption that such bonds were sold for petitioner's own separate trading account, there is no evidence of record to show on what date the bonds were definitely appropriated to such

purposes. Consequently, for want of such evidence, we sustain respondent's determination that these bonds were held for sale to petitioner's customers in the ordinary course of its business.

The disputed bonds of Chicago, Milwaukee & St. Paul, in an aggregate face amount of $377,000, were purchased by petitioner at various times in 1942, and $234,000 thereof was held in a New York depository until their delivery in petitioner's margin account in January 1943. No part of this $377,000 block of bonds was ever sold to retail and the entire block was sold to or through Bear, Stearns in January 1943. On the record made, we hold that the bonds, comprising the block here in dispute, were acquired, held and sold in conjunction with petitioner's trading activities on its own account and represented capital assets to petitioner from their respective dates of purchase.

For 1944 petitioner reported as long term capital gains the profits derived from transactions involving sales aggregating 20,000 shares of United Electric & Power preferred stock. We have made detailed findings as to the purposes for which this stock was acquired and held until subsequently sold. The evidence shows that 9,300 of such shares were at one time appropriated and held to cover contracts for the sales of 46,500 shares of United Light and Railways common, when, as, and if issued to petitioner's retail customers, and that for aught there is in the record, the 9,300 shares were so held until the date of their sale to Bear, Stearns. There is no evidence of a change in the purposes for which the shares were held prior to such date. Consequently, respondent's action is approved in so far as it relates to 9,300 shares of the 20,000 shares in dispute. With respect to the remaining 10,700 shares, the evidence preponderates in favor of petitioner's position that the shares were acquired, held, and sold for petitioner's investment and speculation purposes on its own account. Respondent erred in his determination with regard thereto, and we so hold.

Also, in its 1944 return, petitioner reported the loss sustained on the sale of 2,000 shares of Rustless Iron & Steel Company stock as a long term capital loss. We have found as a fact, and here hold, that such shares were acquired for petitioner's own account and risk and not for resale to its customers. These shares, therefore, represented capital assets to petitioner, and respondent's determination to the contrary is reversed.

We turn now to those transactions during the taxable years involving the sales of securities which had been held for less than six months. There were 17 such transactions during 1943. We have found as a fact that those disposed of in 12 of the transactions had, in each instance, been acquired through petitioner's margin account and

held therein from their respective dates of acquisition, without transfer to or withdrawal for retail distribution, until sold therefrom to or through Bear, Stearns. We here hold that the securities involved in these 12 transactions were purchased, held, and sold by petitioner in pursuit of its individual trading and speculating activities, and, therefore, constituted capital assets to petitioner from the time they were respectively acquired until their respective dates of sale. The remaining five transactions in controversy included the sales of certain securities of the Colorado & Southern, Commonwealth & Southern, Consolidated Natural Gas, WAII, Pacific Mutual, and United.

We have found as a fact that the Colorado & Southern bonds were acquired through petitioner's margin account and held therein until after their retirement by the obligor. We here hold that such bonds represented capital assets to petitioner, having been purchased, and, at all times material, held by petitioner for its investment or speculation in its individual capacity as a trader.

The 6,000 shares of Commonwealth & Southern stock in question were purchased through petitioner's margin account. Thereafter, 14 such shares were withdrawn and delivered into petitioner's possession, apparently for retail distribution. The remaining 5,986 shares were retained in petitioner's margin account until the time of sale. On the basis of the evidence adduced relative thereto, we hold that the 5,986 shares in dispute were at no time held by petitioner, in its capacity as dealer, for sale to customers in the ordinary course of business but were bought, held and sold incident to petitioner's trading on its own account and risk. They constituted capital assets from the date of acquisition to the date of sale.

The 6,200 shares of Consolidated stock involved herein were acquired through Bear, Stearns, by petitioner on a when, as, and if issued basis to cover its prior short sales thereof in that amount and on such basis. The evidence shows little else. In respect to these items, we are of the opinion petitioner has not successfully carried its burden of proof. We accordingly hold for respondent.

Petitioner's transactions in the Pacific Mutual stock shares were with Akin-Lambert & Co., presumably another stockbroker. During the period in question petitioner purchased an aggregate of 8,363 such shares from Akin-Lambert and sold 7,363 shares thereof to Akin-Lambert. The other 1,000 shares were transferred and sold to a retail customer. The evidence here is insufficient to enable us to determine, with assurance, the character of the transaction. Wherefore, petitioner, which had the burden of proof, must bear the onus of a failure of proof. Respondent is affirmed.

With respect to the United preferred stock disposed of by petitioner in 1943, we have found as a fact that petitioner acquired 4,000 such

shares through its margin account and that 3,800 thereof were carried in that account until sold therefrom to Bear, Stearns, 200 such shares having been appropriated and withdrawn for retail distribution. We here hold that the sale of the 3,800 shares in controversy resulted in short term capital gain derived from petitioner's trading activities on its own account and risk.

In 1944 petitioner entered into a number of transactions wherein it sold certain securities which had been held by it for less than six months. Such securities had, in most instances, been purchased for petitioner's margin account and held therein intact until sold. There were, however, those instances where the securities sold were the remainder of a larger block which had been so acquired and portions of which had been transferred and withdrawn for retail distribution. There was also one transaction entailing the sale of certain bonds that had been purchased on a when, as, and if issued basis and held until after the issuance thereof. Moreover, some of the securities in question were held in a bank as collateral. Certain of the transactions, which are here the subject of controversy, culminated in the sale of 4,500 shares, 17,400 shares and 3,595 shares of Allis-Chalmers, Electric Bond & Share, and North American, respectively. Excepting these latter transactions and those involving the securities of Chicago & North Western and Western Pacific, both of which have been presented and considered as separate issues herein, it is our conclusion that none of the securities involved therein were property held by petitioner primarily for sale to customers in the ordinary course of its business. Rather, they were acquired for petitioner's speculation purposes on its own account and were thus capital assets. Regarding the securities of Allis-Chalmers, Electric Bond & Share, and North American that were sold, our conclusion is the same only with respect to 4,400 shares, 17,100 shares, and 2,675 shares thereof, respectively.

The next issue is whether 20,000 shares of Chicago & North Western preferred stock sold by petitioner subsequent to October 14, 1944, represented capital assets to petitioner. Respondent has determined that the entire 20,000 shares represented stock in trade to petitioner available for sale to customers in the ordinary course of its business.

As noted above, whether the status of a particular security held by an investment broker is that of stock in trade, held primarily for sale to customers in the ordinary course of business, is purely a question of fact. Those pertinent to this issue have been set forth in our findings of fact. As to the 14,725 shares purchased WAII subsequent to May 8, 1944, the evidence clearly shows that they were acquired and held by petitioner as a trader for investment or speculation. The record is specific that petitioner's acquisition of such shares was part of a plan

to accumulate a sizeable block thereof in anticipation of a proposed dividend. With regard to the remaining 5,275 shares, the contracts under which they were acquired may well have been purchased for petitioner's retail business, the record not showing otherwise. However, upon issuance of the stock, on July 21, 1944, these shares were placed, together with the foregoing 14,725 shares, in an account where they were held for the same purposes pursuant to the above-described plan for accumulation until later sold. The appropriation of these shares to such ends indicates a definite change of petitioner's intentions with respect thereto and effects a transmutation of the shares from whatever their earlier nature may have been to property held for investment or speculation purposes on petitioner's own account. See *Stern Bros. & Co., supra.*

We hold, therefore, that the shares in question constituted capital assets to petitioner from and after July 21, 1944.

The next question presented is whether petitioner's sale in 1944 of 22,174 shares of Western Pacific preferred stock, pursuant to its earlier WAII sell contracts, resulted in short term capital gain, as reported by petitioner, or in ordinary income, as determined by respondent.

Prior to the time the transaction at issue took place, petitioner had contracted to purchase 38,928 shares of Western Pacific Pfd. stock WAII. It had contracted to sell a total of 16,754 such WAII shares to its customers and an aggregate of 22,174 such WAII shares to Bear, Stearns. We are here concerned with the sale made pursuant to petitioner's contracts with Bear, Stearns. These contracts included those for the sale of 9,774 shares, which contracts were executed prior to November 1, 1944, and those entered into after November 1, 1944, for the sale of 12,400 shares. The sales contracts were covered by similar purchase contracts with Bear, Stearns, executed before and after November 1, 1944, respectively. Such purchase contracts were, at all times material, in excess of petitioner's sell contracts with its customers. It is our conclusion that both blocks represented capital assets to petitioner at the time of their acquisition and sale. Accordingly, we so hold.

The next issue relates to certain dividends that petitioner received during the taxable years on its holdings of 2,986 shares of Commonwealth & Southern stock, 3,400 shares of Allis-Chalmers stock, 20,000 shares of Chicago & North Western 5 per cent Pfd. stock, and 2,000 shares of Rustless Iron & Steel stock. The specific question is whether or not the securities involved represented capital assets to petitioner on the dates such dividends were respectively declared and received. If so, the amount of the dividends so received thereon is not includible in petitioner's excess profits net income pursuant to section 711 (a)

(2), I. R. C.[6]  Our holdings hereinabove set forth are dispositive of this issue.  In view thereof, we now answer the question posed in the affirmative and hold that the securities in dispute, namely, 2,986 shares of Commonwealth & Southern stock, 3,400 shares of Allis-Chalmers stock, 20,000 shares Chicago & North Western 5 per cent Pfd. stock, and 2,000 share of Rustless Iron & Steel stock, constituted capital assets to this petitioner on the critical dates involved.

The next issue is whether petitioner's assignments in 1944 of certain contracts for the purchase of new securities of Chicago & North Western WAII resulted in long term capital gain, as reported by petitioner.

The facts pertinent to this issue are briefly these: During 1942 and 1943, petitioner entered into contracts with its customers to sell them various new securities of Chicago & North Western WAII.  These sell contracts were usually covered by purchase contracts made with Bear, Stearns on or about the same dates.  On December 31, 1943, the quantity of new bonds and preferred stock which petitioner had contracted to sell WAII exactly equalled the quantity it had contracted to purchase WAII.  With reference to the new common stock, petitioner had such contracts for the purchase of 49,995 shares and for the sales of 37,924 shares.  Between April 29 and May 18, 1944, petitioner assigned certain of the purchase contracts for each type to Bear, Stearns. Contemporaneous with such assignments, petitioner entered into contracts with Bear, Stearns for the purchase of the same quantity of new securities which it had so assigned.  The assignments were recorded on petitioner's books as being of property having been held for house investment account, while the securities in the same quantity repurchased concurrently therewith were set up "To cover short sales."

Petitioner's position that the contracts so assigned were property held for its own investment or speculation purposes separate and apart from its dealer business, is based primarily upon the testimony of its president during the period involved.  This testimony was to the effect that beginning in late 1943, petitioner segregated the contracts and securities and identified them as to the purposes for which

---

[6] SEC. 711.  EXCESS PROFITS NET INCOME.

(a) Taxable Years Beginning After December 31. 1939.—The excess profits net income for any taxable year beginning after December 31, 1939, shall be the normal-tax net income, as defined in section 13 (a) (2), for such year except that the following adjustments shall be made:

\*　　\*　　\*　　\*　　\*　　\*　　\*

(2) Excess profits credit computed under invested capital credit.—If the excess profits credit is computed under section 714, the adjustments shall be as follows:
(A) Dividends Received.—The credit for dividends received shall apply, without limitation, to all dividends on stock of all corporations, except that no credit for dividends received shall be allowed with respect to dividends (actual or constructive) on stock of foreign personal holding companies or dividends on stock which is not a capital asset.

\*　　\*　　\*　　\*　　\*　　\*　　\*

they were held. However, the documentary evidence relative to the Chicago & North Western Pfd. stock WAII, while strongly indicating that such securities were originally acquired and held to cover petitioner's sales contracts with its customers, fails to show that any segregation or appropriation to other purposes was made prior to the time each individual assignment was effected and recorded. Moreover, petitioner's actions prior to and during the period of transactions here constitute better evidence of its purposes than does testimony based upon memory and hindsight. In this connection, it is of significance to note that no other securities of the type were acquired to cover petitioner's sales to its customers until the time of the assignments in controversy. Further, simultaneously therewith, petitioner entered into contracts with its assignee for the purchase of the same quantity of new securities WAII as the quantity which it had assigned. Such transactions enabled petitioner to derive a substantial profit on which it would be taxed at capital gains rates and at the same time contract to repurchase the identical securities to cover its customer commitments with any loss subsequently sustained thereon being deductible. Under such circumstances, we are of the opinion that the Commissioner was justified in disregarding the transaction, *Higgins* v. *Smith* 308 U. S. 473, and in determining that the amounts in controversy are taxable as ordinary income. Cf. *Stewart Silk Corporation*, 9 T. C. 174.

Inasmuch as the parties have stipulated that the accounts and entries with respect to the Chicago & North Western bonds WAII and common stock WAII, also here involved, were of the same nature, what we have said above is equally applicable to the transactions involving those securities.

It is our conclusion that respondent did not err in his determination with respect thereto, and we so hold.

There remains for our consideration the question of admissible and inadmissible assets for computing petitioner's excess profits credit under the invested capital method. The pertinent portion of the statute involved is section 720, I. R. C.[7]

---

[7] SEC. 720. ADMISSIBLE AND INADMISSIBLE ASSETS.

  (a) DEFINITIONS.—For the purposes of this subchapter—

    (1) The term "inadmissible assets" means—

      (A) Stock in corporations except stock in a foreign personal-holding company, and except stock which is not a capital asset; and

      (B) Except as provided in subsection (d), obligations described in section 22 (b) (4) any part of the interest from which is excludible from gross income or allowable as a credit against net income.

    (2) The term "admissible assets" means all assets other than inadmissible assets.

  (b) RATIO OF INADMISSIBLES TO TOTAL ASSETS.—The amount by which the average invested capital for any taxable year shall be reduced as provided in section 715 shall be an amount which is the same percentage of such average invested capital as the percentage which the total of the inadmissible assets is of the total of admissible and inadmissible assets. For such purposes, the amount attributable to each asset held at any time during

The parties are in agreement that such corporate stocks as we have herein held to represent capital assets and the tax exempt bonds involved, constitute inadmissible assets. They are in disagreement as to the proper treatment to be accorded the various contracts to purchase and to sell certain securities when, as, and if issued.

Petitioner cites and relies upon I. T. 3721, 1945 C. B. 164, to support its contention that the contracts to buy securities WAII constitute items of property separate and apart from the contracts to sell securities WAII, and that, therefore, its assets must include not only the investment in the purchase contracts but also the gross amounts receivable under the sales contracts. Respondent presents no argument as to the applicability or inapplicability of the cited ruling. He takes the position that such contracts have no cost until the liability to perform comes into force; that having no cost, the contracts cannot increase the total of admissible assets; and that, furthermore, the contracts to buy were, in the main, a hedge against the contracts to sell and offset each other.

Thus, the question here resolves itself into whether the contracts, as assets, are to be recognized as individual items of property, or "gross basis," rather than on an "offset" or "net basis" in which the total of contracts to buy and contracts to sell are set off against each other and the net result of all items is utilized.

The ruling cited and relied upon by petitioner provides, in part:

The usual situation in which trading in securities on a "when issued" basis takes place is one in which there is submitted a plan of reorganization of a corporation providing for the issuance, in exchange for its outstanding securities, of securities of a new corporation or of new securities of the reorganized old corporation. Before such a plan of reorganization actually becomes effective the approval of the interested security holders must be obtained or the plan must be approved by regulatory bodies or the courts. There is often litigation as a result of which the plan of reorganization may be abandoned or approved in a modified form. The time elapsing between the submission of the plan and the actual exchange of old securities for new securities under the plan, or the plan as modified, may be as much as several years. After the submission of the plan of reorganization, trading may be commenced in the new securities which are to be issued under the plan of reorganization. Inasmuch as these new securities are not in existence, and will never come into existence if the plan of reorganization is not carried out, the trading is on the basis of "when, as, and if issued," commonly called "when issued." The trading is carried on by the execution of contracts for the purchase and sale of the new securities "when issued" at specified prices.

---

such taxable year shall be determined by ascertaining the adjusted basis thereof (or, in the case of money, the amount thereof) for each day of such taxable year so held and adding such daily amounts. The determination of such daily amounts shall be made under regulations prescribed by the Commissioner with the approval of the Secretary. The adjusted basis shall be the adjusted basis for determining loss upon sale or exchange as determined under section 113.

Continuing, the ruling sets out several specific examples in which it is held that when a taxpayer, who does not own old stock of a particular corporation, enters into a contract to buy or sell the new securities of that corporation when, as, and if issued, "* * * acquires the right to purchase (or to sell) that stock when it is issued * * *" and that "* * * the right so acquired constitutes a 'capital asset' as that term is defined in section 117 (a) (1) of the Code * * *." Further, when such taxpayer "* * * enters into a 'when issued' buy or sell contract and some time thereafter enters into a 'when issued' sell or buy contract at a different price with the result that, provided the reorganization is consummated, he is assured of a profit from the combination of the two contracts * * *, the contract to buy and the contract to sell are to be treated as entirely separate capital assets." Moreover, it is ruled that while a "when issued" contract to buy or to sell may have cost the taxpayer nothing in cash at the time it was executed, nevertheless, such taxpayer had obligated himself to carry out the contract pursuant to its terms, and this obligation should be treated as part of the contract's basis in the taxpayer's hands in determining his gain or loss on its disposition.

I. T. 3721, *supra*, is an interpretation of section 117, I. R. C., and involves the question of whether "when issued" contracts are capital assets within the meaning of that section, and, if so, the proper treatment thereof for Federal tax purposes. Hence, the conclusions expressed therein are restricted "* * * to transactions entered into by investors and traders in securities but are not applicable to transactions entered into by dealers in securities where such transactions constitute a part of the business of dealers in securities." [8] No question arises here as to the status of the contracts in dispute, i. e., whether or not they are capital assets. However, the rationale of the foregoing ruling would appear applicable to the instant situation in so far as it relates to the treatment of such contracts as separate items of property and as to the tax bases to be used therefor. Such application devitalizes the position taken by respondent.

Therefore, we hold that the contracts in controversy are to be recognized as individual assets, i. e., on a "gross basis" rather than on a "net basis" in computing the percentage of inadmissible to total assets under section 720, *supra*. Cf. *Modesto Dry Yard, Inc.*, 14 T. C. 374.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

MURDOCK, *J.*, dissenting: I do not agree that the money borrowed to purchase the Federal Land Bank bonds represented borrowed capital.

---

[8] By special letter ruling dated August 18, 1950, I. T. 3721 was held to apply to a corporate dealer in securities where such contracts are acquired for investment purposes and not in conjunction with its business as a dealer in securities.

The taxpayer purchased those bonds knowing that it would sustain an income loss because it borrowed money to buy the bonds at an interest rate higher than that paid by the bonds. The only advantage which it expected was a tax advantage in that it thought, mistakenly, that the interest on the bonds would be tax exempt and it would be allowed a deduction for the interest on the money borrowed. This point should be decided against the petitioner on the authority of *Hart-Bartlett-Sturtevant Grain Co.*, 12 T. C. 760, affd. 182 F. 2d 153, which can not be distinguished satisfactorily.

TURNER, HARRON, and RAUM, *JJ.*, agree with this dissent.